JOHN LUCK v. MINNEAPOLIS STREET RAILWAY COMPANY.
RUBY LUCK v. SAME.
JOHN ROBERTS LUCK v. SAME.[1]

May 4, 1934.

Nos. 29,802, 29,818.

[1]Reported in 254 N. W. 609.

504

*Ralph T. Boardman* and *John F. Dulebohn,* for appellant-respondent Minneapolis Street Railway Company.

*Cobb, Hoke, Benson, Krause & Faegre* and *Frank Janes,* for respondents and for appellant John Luck.

*JULIUS J. OLSON, Justice.*

Five negligence cases were tried together in the court below, resulting in verdicts for the respective plaintiffs in four thereof and for the defendant in the fifth. The cases have been submitted together here.

Defendant, having moved for judgment notwithstanding the verdict or for a new trial in each of the four cases wherein the verdicts were against it and same having been denied, has brought the cases aforesaid here for review. In the fifth case plaintiff moved for a new trial. That being denied, he has appealed from the order so made.

As is customary in cases of this nature, there is a sharp conflict in the evidence in respect of who is to be blamed for the accident. A brief summary of the essential facts should be made. Cedar avenue is paved and extends in the location where this accident occurred in a general northerly and southerly direction. Upon it are located street car tracks, the easterly tracks carrying traffic in a northerly and the westerly tracks in a southerly direction. At the point of accident, a short distance south of where Thirty-second street crosses Cedar avenue at right angles, the entire width of the street is 40.65 feet. The distance between the westerly curb and the westerly street car rail is 12 feet 8 inches.

On the evening of December 26, 1931, at about 10:45 o'clock, John Luck and his wife, Ruby, and three children were driving in his five-passenger Velie sedan on their way home, they having visited that evening with his wife's folks. Mr. Luck was driving, his wife sitting immediately to his right in the front seat holding their baby boy, Robert, seven months old, in her lap. The girls, Shirley and Geraldine, aged four and one-half and three years, were occupying the back seat. Plaintiff's story can best be told in his own language as follows:

"I drove straight south on Cedar; I caught up with a street car headed in the same direction but was unable to pass it on account of cars parked in the various blocks. I arrived at Lake street, and, after crossing Lake street, there were still cars parked, on the right-hand side of course, and I was still unable to pass it. This compelled me to remain behind the street car until I reached Thirty-first, and there was still cars parked in the block from Thirty-first to Thirty-second, down possibly to near the halfway mark; then there was an opening. I had been following the street car right along, so

I decided to pass it. So I passed these parked cars, following the street car, and then commenced to draw ahead of the street car. About two-thirds of the way down the block, I was able to draw in front of the street car, passed the street car, but I still maintained my driving on the right-hand side of the street until I came to the intersection; the street car now was behind me.· I had forgotten about the street car; I was ahead of it as I entered the intersection. The yellow light flashed on the stop-and-go; I had entered, consequently I continued on across the intersection, on the right-hand side; there was a car parked; naturally I had to swing out to pass it. As I swung out to pass the parked car, there was a violent crash from the rear, seemed to lift the car up, an enormous crash, and oblivion."

In behalf of defendant, the street car motorman on the car which was found by the jury to have been the cause of the accident, at least to the extent of being a contributing cause, tells his story in the following way:

After leaving Thirty-first street and going toward Thirty-second the highest speed attained in that block was 25 miles an hour. As he approached Thirty-second street he "throwed the power off and slowed down to 20 miles an hour." He claims that the semaphore located at the center of the intersection read "go"; that he did not come to a stop but proceeded across the intersection, increasing the speed to about 23 miles per hour. He denies that any automobile passed his car prior to reaching the intersection; that the first time he saw the Luck automobile was when it "was coming up right along by my front mirror, by the front doors of the street car, and I had already gone past the building line on the south side of Thirty-second street." He further testified: "The moment I seen that automobile I throwed the current off, I pulled the emergency brake and applied the sand." There was an automobile parked on the west side of Cedar avenue, near the corner of Thirty-second street, about 12 feet from the cross-walk. Again quoting the witness: "That automobile, the Luck automobile, cut in between this parked automobile and the front end of my street car. He scraped

the right-hand side of the street car, just scraped it, and he went right straight across, parallel, across the southbound street car [track] and cut over on the northbound street car track and run into the northbound street car. I was coming along at 23 miles an hour with my car, and he was going this way. After he struck the southbound street car, it checked him, and I came along with my street car and plowed right into him."

There is evidence in the case to support the claims of both these witnesses. In behalf of plaintiff there is the testimony of one Degidio and wife, their daughter Marjorie, 11 years old at the time of trial, and one Blomgren. The Degidio car had followed the Luck car over a considerable distance before reaching the intersection of Thirty-second street and Cedar avenue. It is claimed by them that the Luck car entered the intersection immediately before the semaphore changed from "go" to "stop"; that at this particular moment the Degidio car was approximately at the same point from the intersection as the street car; that the street car did not stop but increased its speed into and across the intersection; that the "stop" sign was operative against the traffic both as to the street car as well as the other traffic coming from that direction; that Degidio stopped his car because of the "stop" sign operating against him; that he saw the accident from across the street, where his car was temporarily stopped and observed that the southbound street car hit Luck's car from the rear and threw it forward so that it came in contact with the street car coming from the opposite direction.

Because of this collision Luck's car was caught between the two street cars in such a way as to demolish it entirely. Two of the children, the boy Robert and the girl Shirley, died shortly thereafter. Mr. Luck suffered very severe injuries, his left leg being later amputated so as to leave only a seven-inch stub or stump. Ruby Luck, the mother, and the girl Geraldine both suffered severe and permanent injuries.

In each complaint the defendant is charged with wilful and wanton negligence. Negligence is also alleged in respect of the

movements of both street cars. In behalf of defendant, all allegations of negligence are denied, and it is contended that the accident was caused solely because of the negligence of John Luck, husband and father, the driver of the car. The court instructed the jury that there was no proof of wilful negligence and eliminated the question. The motorman of the northbound street car was also absolved of negligence. But the court submitted to the jury the question of negligence as to the motorman operating the southbound street car. The negligence question involved the following:

(1) Whether the street car ran through the stop signal.

(2) Negligent rate of speed.

(3) Failure to keep a proper lookout.

(4) Failure to keep the car under proper control.

(5) Failure to give warning.

It is not disputed that no warning signal was given by either motorman. The question of speed, failure to give warning, and the other related questions mentioned were under proper instructions submitted to the jury for decision. There is evidence in the case supporting these respective claims.

The following verdicts were rendered: In the case of Luck as father and natural guardian of Geraldine Luck, a minor, the jury awarded plaintiff $5,169.05; Ruby Luck, wife of Mr. Luck, $13,741; Luck as special administrator of the estate of Shirley Luck, $1,349.85, and Luck as special administrator of the estate of Robert Luck, $1,372.75. In the case of John Luck, husband and father, brought by him in his own behalf, the jury returned a verdict for the defendant.

Upon defendant's motion in the four cases wherein verdicts were returned against it the court granted a reduction of the verdicts as follows: In the Geraldine Luck case the verdict was reduced to $5,000; Ruby Luck to $10,000; and in the two death cases to $1,250 each. Plaintiffs duly consented to the reductions.

Defendant has assigned 19 errors, which may be grouped under the following classifications:

(1) In refusing to direct verdicts for defendant or granting judgment notwithstanding the verdicts.

(2) In denying defendant's motion for new trials on the ground of excessive damages.

(3) In denying defendant's motion for new trial "in the interests of justice."

(4) In respect of certain evidence admitted over objection on the part of defendant and in the giving of certain instructions.

(5) In not reducing the verdicts in the two death cases by one-third on the ground that the father, John Luck, was not entitled to share in that recovery.

(6) On plaintiff's motion for a new trial in the John Luck case, in refusing to submit to the jury the question of wilful and wanton negligence on the part of defendant.

■ Defendant earnestly contends that the evidence is such as to compel a finding that this disastrous accident was caused solely by the negligence of John Luck and that it was not negligent in any of the cases. A careful review of the testimony refutes the claim. It is not for us to weigh the testimony, nor can we determine the credibility of witnesses. From what has been related it is obvious that purely fact questions are involved; that the jury has determined the same upon sufficient evidence, and these are binding upon us. In view of the facts and circumstances hereinbefore related, we think the court properly submitted to the jury the negligence questions hereinbefore enumerated. Necessarily the various items going into the negligence question are so interwoven and correlated that it is difficult to say which was the compelling or proximate cause of the accident. That the accident was caused by someone's negligence is beyond question. The evidence does not permit any other conclusion than that either the motorman of the southbound street car or John Luck, the driver of the automobile, or both, were the negligent parties. The fact that the street car "plowed right into" the rear end of the Luck automobile immediately south of the intersection and at a point where the parked automobile would compel the driver of an automobile going in the same

direction as the street car to swing onto the tracks to get by may well have led the jury to believe that the motorman was not exercising ordinary care in failing to give any signal and in increasing his speed after entering the intersection. The court instructed the jury on this phase:

"I instruct you that if the negligence of John Luck, the driver of the automobile, was the sole cause of this accident, then your verdict must be for the defendant in all of these cases."

In defendant's behalf it appears equally clear that the jury was well justified in finding that Mr. Luck, in seeking to get around the parked car, was, under the circumstances here appearing, also negligent and that the negligence of both contributed to the common disaster.

It is the settled rule in this state, and it is the general rule, that if any injury be caused by the concurring negligence of defendant and a third person, the defendant is liable to the same extent as though it had been caused by his negligence alone. This has been so frequently stated and repeated that citation of authorities is deemed unnecessary. If such is desired, the late case of Miller v. Union Pac. R. Co. 290 U. S. 227, 54 S. Ct. 172, 78 L. ed. 147 (and see particularly cases cited on p. 236 of 290 U. S., 54 S. Ct. 174, 78 L. ed. 151), furnishes such.

In respect of warning and keeping a vigilant lookout, the case of Newton v. Minneapolis St. Ry. Co. 186 Minn. 439, 443, 243 N. W. 684, 686, is instructive. The court there said:

"If the boy was moving on in front of the car, as plaintiff's evidence tends to show, the speeding up of the car so that it was likely to run him down without warning him by the means available to the motorman was certainly a fact to be considered by the jury on the issue of defendant's negligence. The court evidently thought that, since the boy was unaware that the car was moving only 10 or 15 feet behind, the failure to warn him of that fact was of no consequence. It must be remembered that we are dealing with a child, who might overestimate his ability to outdistance the car and reach safety before being overtaken. The failure to give a signal, if

the boy was in the position he claims, would also be persuasive evidence that the motorman was not attending to his duties of keeping a vigilant lookout for persons in front of the car, for it is inconceivable that he would have proceeded, had he seen the boy, without giving the customary signals."

■ Are the damages as reduced by the trial court excessive? Taking up the cases in the order in which they appear in the record, we have first that of Geraldine Luck. In that case the jury awarded her $5,169.05. It was reduced by the trial court to $5,000. At the time of her injury she was only three years of age. She suffered a fracture of the jaw resulting in malocclusion of the teeth. It was impossible to say at the time of trial to what extent this will interfere with her permanent teeth. Her face became asymmetrical, "bulging, one side deformed, the other natural." There were deep lacerations of the lower lip which though healed left "a livid scar, [a] slight depression." She was suffering with a shortening of the left femur and will always have a noticeable, even if slight, limp. She remained in the hospital from the time of injury until the middle of February following. We cannot say that this verdict in the amount to which it was reduced by the trial court is excessive.

The next case is that of the wife, Ruby Luck, to whom the jury awarded a verdict of $13,741. The trial court reduced the verdict to $10,000. At the time of her injury she was 26 years of age, the mother of three children, four and one-half, three years, and seven months of age. Both hips were dislocated. She had a fracture of the head of the femur "right at the hip joint," multiple fractures of the pelvis, including a fracture of the sacrum. She had other injuries of a permanent nature. She was taken to the hospital and remained in bed until the first part of February following. Shortly before the trial she had again been examined by competent physicians, and it was found that she was still suffering with limitation of movements of her right hip "where there was a limitation of motion of abduction, that is, a swinging of the thigh outward; adduction, swinging the thigh inward, and movement of the hip and thigh back and forth and around, called rotation. I found that there had been considerable improvement since the examina-

tion a year ago. The present condition I felt was permanent, and I felt that the objective findings confirmed the subjective complaints." The doctor was of the opinion that her condition is permanent.

In all of the cases where recovery was had it should be noted that the award was in odd amounts. This the trial court corrected, it appearing that the jury had erroneously allowed to the respective plaintiffs items of hospital and doctor bills and, in the two death cases, also funeral expenses. In the case of Geraldine Luck the hospital and doctor bills amounted to $169.05; hence that sum was deducted from the recovery. In the Ruby Luck case these items amounted to $241. The court not only deducted this sum but also an additional sum of $3,500, thus leaving the net amount of her recovery $10,000. In view of the pain and suffering that she has undergone and the fact that she is in an injured condition that is permanent, we are not disposed to interfere with the amount determined by the trial court.

In the two death cases, Shirley and Robert Luck, the court reduced the verdicts to $1,250 in each case. In the Shirley Luck case the verdict was $1,349.85. The hospital bill was $9.85 and the funeral expenses $90. These items were deducted from the recovery, thus leaving the amount as stated, $1,250. In the Robert Luck case the verdict was $1,372.75. The hospital and doctor bills amounted to $32.75, funeral expenses $90. Deducting these sums from the recovery leaves the amount as reduced by the trial court, $1,250. These awards are conservative, and we are not disposed to disturb either of them.

■ Do the "interests of justice" require the granting of a new trial? From what has been heretofore said it does not seem necessary to spend much time upon this particular phase of the case. Counsel for defendant has with commendable energy and enterprise summarized the testimony of the various witnesses and has ably discussed the reasons why in his opinion a reversal should be had for the accomplishment of this purpose. We are not here trying fact issues. That matter is and must necessarily be had by and before the trial court and the triers of fact. In the instant case

there is evidence to sustain the respective theories advanced by the contending forces. The jury was instructed fully and accurately on each issue involved. The case was tried by counsel of eminent standing in the profession and before a court of long experience and thorough training. The trial judge in charging the jury said:

"You have been privileged to hear in the trial of these cases a very able presentation by counsel on both sides. There has been no cheap bickering, no pettifogging, and each counsel has shown a commendable spirit of fairness and endeavored to present to you the evidence in such a way that you may intelligently pass upon it."

We approve of everything the court said in this regard because it is merited.

With this background to the picture, it does not seem to us appropriate further to discuss this particular question.

■  Several errors are covered under this subdivision. The first relates to a photograph, plaintiffs' exhibit B, admitted in evidence over defendant's objection. The photograph has been examined by us. It was identified by one of plaintiffs' witnesses who said that the scene portrayed in the photograph "is the way it looked when they were jacked up," referring to the street cars immediately after the accident. In view of the fact that defendant introduced four different photographs of the same cars, after they had been separated from the debris and moved to separate locations, it does not seem to us that there can be any doubt about the propriety of permitting this photograph to go in. See Kouri v. Olson-Keogh Produce Co. 191 Minn. 101, 253 N. W. 98. Admittedly the scene is what it portrays, the location and condition of the cars before being moved except that they were "jacked up" to permit the removal of the injured plaintiffs from the wreckage.

The next claimed error relates to the admission in evidence of certain items of hospital and medical expenses. As we have heretofore seen, these items have been removed from the case by order of the trial court. The jury were instructed that all these items of expense could only be recovered by the plaintiff John Luck in his own action. Evidently the jury misunderstood what was in-

tended, because, as we have heretofore shown, the sum applicable to each plaintiff appears to have been added to the general verdict. But there is no harm at all in this because the items are out of the case.

The next relates to a statement made by a witness while being cross-examined by plaintiffs. To understand the situation, this should be noted: When the motorman of the southbound street car returned from a recess of the court he stated that he wished to change his previous testimony regarding a certain fact to which he had testified. Counsel for plaintiffs inquired with whom he had conversed during the recess. He gave the name of his conductor. The next question asked by counsel was, "What was the conversation?" The witness answered:

"We was talking about the street cars and how fast they were going; how fast the other car was going, and I said I think I made a mistake when I estimated 40 feet. He said, 'I don't know whether you did or not; I didn't see it.' I said, 'I know that car now, taking a second thought, looking it over a second time, that car was more than 40 feet from my car when Luck's car passed there,' which it was."

Obviously there was no error in permitting this testimony to come into the case or in leaving it there.

The next claimed error relates to the testimony of the little girl Marjorie Degidio, who was called in rebuttal. It is true that some of her testimony was not strictly rebuttal, but this is fully explained in the record, counsel for plaintiffs stating: "The only questions that will be asked will have for their purpose establishing the fact that the family was there. We won't ask her any details about how far the car was, where this car was or where that was." And further: "No, I don't rely upon it as substantial evidence of those facts, but I think it should remain in the record as evidence of the strictly rebuttal issue as to whether the Degidios were there when the accident happened." The court then ruled: "To that extent it may stand." This testimony was important because of a development at the trial wherein certain witnesses for the defend-

ant contradicted a very material part of the testimony of Mr. and Mrs. Degidio, virtually asserting that they (the Degidios) were not at the scene of the accident. It therefore became important for plaintiffs to show that fact. It had been testified by the parents that this girl was with them and was in their car at the time this accident occurred. To show that she knew what she was talking about it seems perfectly proper that she should be permitted to say something about what she saw and observed at the time of the accident. She appears to be a bright little girl; while only 11 years old at the time of trial, yet it appears that she was in the fifth grade of her school work. It also seems that her testimony would be admissible even if it were not properly rebuttal because of the large discretion that the trial court has in permitting evidence to go in where the same is material to the issues.

The next relates to an instruction given by the court in respect of a requested instruction which the court did not give in the form requested but in its own language as follows:

"In applying the rules of reasonable care as to the conduct of the motorman of defendant's southbound street car, regard must be had to the construction, weight, motive power, and mode of operation of street cars and of the further fact that they run on rigid tracks and cannot turn out; and regard must also be had to the undisputed testimony in these cases as to the distances within which street cars of the types here involved could be stopped while running at the speeds shown by the testimony; and to the further testimony as to what was actually done by the motorman of the southbound street car to stop said street car when danger of a collision first became apparent to him."

The instruction correctly covers the situation and substantially conforms with the one requested.

It is asserted by defendant that the verdicts in the two death cases must be reduced to the extent of one-third in each case because the jury found that plaintiff John Luck was contributorily negligent; hence that he should not be permitted by reason of these verdicts to profit by his own negligence. It has been assumed that

where there is contributory negligence on the part of the sole beneficiary no recovery can be had. Mattson v. Minnesota & N. W. R. Co. 98 Minn. 296, 108 N. W. 517; Decker v. Itasca Paper Co. 111 Minn. 439, 127 N. W. 183. But it has also been held that one beneficiary cannot prejudice the rights of another by making a settlement. McVeigh v. Minneapolis & R. R. Ry. Co. 110 Minn. 184, 124 N. W. 971. The question is set at rest in the recent case of Anderson v. Anderson, 188 Minn. 602, 248 N. W. 35, 37. It was there decided that inasmuch as defendants did not ask for a reduction or apportionment because of the negligence of a beneficiary no complaint could be made after a general verdict had been found favorable to the administratrix. The court said [188 Minn. 608]:

"The recovery in an action for death by wrongful act is not for the benefit of the estate but for the benefit of the surviving spouse and next of kin."

The verdicts in these cases are small. It is not to be assumed that the trial judge, who has plenary power in respect of the distribution of the funds, will permit the negligent father to share in these recoveries. If defendant had requested appropriate instructions covering the point and such request had been denied, there would be room for its present claim. But such request was not made, nor was any instruction given on this phase of the case; hence we cannot assume that there is error.

■ Upon plaintiff's appeal in the case of John Luck the trial court held that as a matter of law the motorman of the southbound car was not guilty of wilful or wanton negligence. Complaint is now made by plaintiff that the court erred in refusing to instruct the jury upon that issue. We have heretofore quoted rather extensively from the record in respect of what the claims of the parties are. From this discussion it appears obvious that the trial court was right. We see no reason for further discussion of this question.

The orders appealed from are affirmed.

*DEVANEY, Chief Justice,* took no part.