STATE v. FRANK GARDEN.

125 N. W. (2d) 591.

December 13, 1963—No. 38,590.

*Whitney E. Tarutis,* for appellant.

*Walter F. Mondale,* Attorney General, and *Charles E. Houston,* Solicitor General, for respondent.

THOMAS GALLAGHER, JUSTICE.

Defendant was convicted of murder in the first degree by a district court jury in Hubbard County. On this appeal he contends that the court erred (1) in denying a motion made at the arraignment to dismiss the indictment on the ground that "there existed no group or list from which a panel of Grand Jurors could legally be selected" to return such indictment; (2) in the admission and exclusion of certain evidence as hereafter described; and (3) in permitting certain trial procedures as hereafter set forth. He also contends that the evidence is insufficient to support the verdict of guilty.

On November 11, 1960, 4 days after a dispute in a Cass Lake 3.2 tavern, in which Mrs. Dorothy Parmenter, one of the owners of the tavern, Oscar Johnson, the deceased, and defendant had participated, the body of Johnson was found buried near his rural home in Hubbard County. A lead slug fired from a 12-gauge shotgun had caused his death. On November 9, 1960, defendant was arrested on suspicion of murder. Pursuant to an order of the District Court of Hubbard County directing that a grand jury be convened, one was selected on November 14, 1960, as hereafter described. On December 1, 1960, it returned an indictment against defendant for the first-degree murder of Oscar Johnson, and on December 2 he was presented for arraignment there-

on. This was his first appearance in any proceedings and, upon a showing of indigence, the court appointed counsel for him. The arraignment was then continued to December 5, and defendant's bond was fixed at $50,000. On December 5 defendant's counsel moved to dismiss the indictment on the ground above described. The arraignment was continued until December 6, and at that time the court stated:

"* * * [T]he Court feels that the present motion cannot be decided unless evidence is taken * * *.

"Further, the Court feels * * * that the Court itself should * * * examine the witnesses, and then that either side may ask such additional questions as you may deem necessary * * *."

The testimony of witnesses called pursuant to the foregoing may be summarized as follows: Dell Leaman, auditor of Hubbard County, who also served as clerk of the board of county commissioners,[1] testified that at the meeting of the county commissioners in January 1960 each of the five commissioners had selected from the qualified voters of Hubbard County a number of prospective grand jurors for the year 1960, totaling 86 in all, which lists they had then delivered to her; that in accordance with custom she had then placed such lists in a filing cabinet in her office;[2] that on November 14, when she received the order calling for a grand jury, she had selected from such lists 72 names of prospective grand jurors. This latter list she had typewritten and, after attesting to its official character, had delivered to the clerk of the district court. However, the signature of the chairman of the county board was not placed thereon.[3] The witness testified that there had been no

---

[1]Minn. St. 384.09 provides in part: "The county auditor by virtue of his office shall be clerk of the county board, keep an accurate record of its official proceedings, carefully preserve all documents, books, records, maps, and other papers required to be deposited in his office, and annually prepare a financial statement of the county, unless otherwise ordered by the board."

[2]The court took judicial notice that the last previous grand jury called in Hubbard County had been in the late 1930's.

[3]Minn. St. 593.13 provides in part: "The county board, at its annual session in January, shall select, from the qualified voters of the county, 72 persons to serve as grand jurors, and 144 persons to serve as petit jurors, and

meeting of the county board on November 14 and that there were no minutes of such board to show that as a unit it had determined that the five separate lists of names submitted to her after the January meeting constituted the official grand jury list.

Temple Hinds, chairman of the county board, admitted that, on the day that the list of 72 names had been prepared by the county auditor and delivered to the clerk of the district court, there had been no meeting of the board and that he had not signed such list.

The court questioned him as follows:

"Q   Are you now prepared to say that this is a correct list of the names of the persons properly qualified selected from the qualified voters of said county by the said County Board at its annual meeting held on the 5th day of January, 1960 to serve as grand jurors in the District Court, Ninth Judicial District in and for the County of Hubbard * * * and that said list does not contain the names of any persons drawn for service in a preceding annual list?

"A   I am; yes, sir.

"Q   And do you so say and swear?

"A   That is right.

\*     \*     \*     \*     \*

"Q   [on cross-examination] And you and your board never collectively, together, agreed upon that list as a grand jury list?

"A   We agreed upon that list, yes, upon the 1st day of January when we wrote these names in the book.

"Q   Do you have any record of that, any resolutions?

"A   No * * *.

"Q   Minutes of that?

"A   No minutes, but our handwriting there and those names are all in our handwriting."

Mr. E. W. Andrews, clerk of the District Court of Hubbard County, testified as follows:

---

make separate lists thereof, which shall be certified and signed by the chairman, attested by the auditor, and forthwith delivered to the clerk of the district court."

"Q [by the court] And what did you do in preparation for the drawing of the grand jury?

"A After receiving this list from the Auditor, I typed up the 72 names on the prescribed sheets or list and then I contacted the sheriff and * * * a justice of the peace and shortly after lunch * * * we drew the 23 names which I then typed and delivered to the sheriff, sometime during the afternoon * * *."[4]

It is not disputed that the 23 names selected by the clerk from this list constituted the grand jury which returned the indictment against defendant. Following consideration of the foregoing evidence, the court denied defendant's motion to dismiss the indictment.

Trial commenced on January 30, 1961. Defendant was represented by Mr. W. E. Tarutis as counsel, and evidence was received as follows: Mrs. Parmenter, one of the owners of the 3.2 tavern where the quarrel occurred, testified that at about 3 p. m. on November 7, 1960, someone had told her that defendant had picked up, from the bar, some small change belonging to Oscar Johnson, who had left the tavern for a few minutes; that she had then accused defendant of taking it and had searched him but had failed to find the money on his person; that he then stated that he would "get even" with her and Johnson—that he could "hide bodies where they never could be found"; that Johnson had then said that he, defendant, had threatened to shoot Johnson for a long time and asked him when he was going to do it; and that defendant had then replied, "It might be sooner than you think." Mrs. Parmenter then ordered defendant to leave the tavern.

Mr. Peter Haave testified that he had seen defendant pick up a dime from the bar, but had heard no conversation between Johnson and defendant; that defendant had returned later looking for a wrench and he had then heard defendant say either to Mrs. Parmenter or Johnson, "I will get you." Mr. B. A. Black testified that he had observed de-

---

[4] Minn. St. 628.45 provides in part: "* * * At least 15 days before the sitting of any district court, the clerk thereof, in the presence of the sheriff or his deputy and a justice of the peace, or judge of the district court * * *, shall draw from the box the names of 23 persons to serve as grand jurors at such term of court."

fendant in front of the tavern while Mrs. Parmenter was escorting him from her premises, and that defendant had not attempted to come back into the bar at the time but had walked on down the street. A number of other witnesses testified to seeing defendant and Johnson in the tavern, but all of them testified that they had heard no argument or threats between them.

Other witnesses testified that when Johnson did not vote in the election of November 8, 1960, a search was instituted for him; that examination of his house on November 9 disclosed blood on the floor of a small porch and the steps leading to it, and an expended 12-gauge shotgun shell just outside its south window; that shell wadding was found both on the outside and inside of the house near such window; that a pair of spectacles with blood and snow on them was found near the bottom step to the porch; that the south window pane was broken; that the window screen had a hole in it; that there was a hole through the door between the porch and the kitchen and another on an inside wall; and that an expended lead slug was found in the interior of the house.

There was testimony that, while Sheriff Robert J. Potter of Hubbard County and Sheriff John Cahill of Beltrami County were searching Johnson's premises on November 9, they learned about the dispute at the 3.2 tavern; that shortly thereafter defendant had been taken into custody and lodged in the Cass Lake jail by a police officer of Cass Lake; that after his arrest defendant had stated that he knew that Johnson had disappeared, having heard the same from a radio news broadcast at 10 p. m. on November 8 (there had been no such broadcast); but that he knew nothing about it and did not own a 12-gauge shotgun; that he then consented that his house might be searched and that Sheriffs Potter and Cahill had searched it while he remained in custody; that in this search they had found a 12-gauge shotgun, a bloody sweat shirt, and a container holding two 12-gauge shotgun shells loaded with slugs, similar to the expended shell found outside Johnson's window.

Sheriff Potter testified that upon his return from this search on November 9, he had again conferred with defendant at the Cass Lake jail

but that no further statement was made at this time; that it was then determined to transport defendant to the Hubbard County jail at Park Rapids; that on the way defendant had been lodged in the jail at Walker while Sheriffs Potter and Simpson (of Cass County) had their evening meal; that Potter then continued on the trip to Park Rapids with defendant; that during this ride defendant admitted that he had previously served time in the State Prison at Stillwater for a felony and insisted that he had no hard feelings against Johnson; that on arrival at Park Rapids defendant was placed in prison garb and confined in the county jail; that on November 10 he (Potter) again searched Johnson's premises in an unsuccessful attempt to locate Johnson's body; that later that same day he had a further conversation with defendant at which Mr. Gary Nelson of the Minnesota Crime Bureau was present; that in this conversation, which commenced about 8:30 p. m. and continued for about 1½ hours, defendant continued to deny any knowledge of Johnson's disappearance until he (Potter) finally suggested that "it could have been an accident from your point," whereupon defendant had stated, "It could have been"; that defendant had then made a map showing where he had buried Johnson's body and had given a statement in which he claimed that Johnson's death was the result of an accidental discharge of the 12-gauge shotgun; that this statement had then been typewritten by Nelson and signed by defendant in the presence of Nelson and Potter; that an unsigned copy was then handed to defendant (this statement was offered in evidence but was rejected on the ground that the unsigned copy did not meet the requirements of Minn. St. 611.033);[5] that immediately following this statement, he and Nelson had gone to Johnson's premises where, by using defendant's map, they had located Johnson's body.

Sheriff Potter further testified that on Saturday, November 12, 1960,

---

[5] Minn. St. 611.033 provides: "No statement, confession, or admission in writing shall be received in evidence in any criminal proceeding against any defendant unless at the time of the taking thereof such defendant shall have been furnished with a copy thereof and which statement, confession, or admission shall have endorsed thereon or attached thereto the receipt of the accused which shall state that a copy thereof has been received by him."

he had had an interview with defendant at which Police Officer Orville Kain of the Park Rapids Police Department and a stenographer from Park Rapids were present; that defendant's statements were then taken down in shorthand and later typewritten and signed by defendant; that during this time some attorney[6] had appeared and conferred with defendant but then left; that after such attorney had left the typewritten statement had been handed to defendant; and that he had retained it until the following Monday morning when he had signed it.

In this statement, received in evidence over objection, defendant claimed he had gone to Johnson's house on the evening of November 7, 1960, to pick up some 12-gauge shotgun shells which Johnson had promised him; and that after the gun had been loaded with one of such shells it had dropped and accidentally discharged, the slug penetrating Johnson and causing his death. Therein he described this as follows:

"Well, Oscar [Johnson] gave me the 5 shells then I loaded the gun, then the gun slipped and fell and went off.

\* \* \* \* \*

"Q: You put the shells in the gun that went off?

"A: He did.

\* \* \* \* \*

"Q: What did you do with the shells he [Johnson] had in his hand?

"A: He gave them to me and I put them in my pocket.

\* \* \* \* \*

"Q: That was fired by the gun that you had, if so, and you say the gun dropped and hit the floor and went off?

"A: Yes, he set the gun down and the jar made it go off, it kind of slipped and went off and the butt or something hit me."

Sheriff Potter further testified without objection that on November 26, 1960, he again conversed with defendant in the latter's cell, no one

---

[6]This is the first indication of any representation of defendant by counsel. The record discloses no further reference to this counsel and no hearing of any kind until defendant appeared for arraignment on December 2, 1960.

else being present; that defendant had then made an oral statement wherein he had admitted deliberately shooting Johnson the evening of November 7, 1960, firing the shot from just outside the south window of the porch described; and that he had agreed to sign a written statement to such effect, but when a stenographer was obtained to take it down, defendant had refused to repeat it; and that in such conversation he had described the shooting as follows:

"* * * 'I drove over to * * * Mr. Johnson's house, parked my car with the headlights on the door of the porch, got out, took my gun out of the back seat, walked around behind the car, over to the south window of the south porch, there I stood and waited for Mr. Johnson to come out. Mr. Johnson did not come out right away so I hollered. Mr. Johnson came out to the front door of the steps and turned around and started back into the house, and I shot him through the window.' * * *"

The sheriff also testified that defendant had admitted—

"* * * that the shells that he had were his and he [defendant] had the gun loaded when he went there."

Defendant in his testimony denied making the latter statements to Potter and affirmed his previous statements that the shooting had been accidental and had occurred when he had driven his car to Johnson's house on the evening of November 7 to pick up some shells which Johnson had promised him. He testified that at that time Johnson had asked for the gun so that he might examine it and had then inserted one of the shells therein; that while it was being handled it had dropped on the cupboard on the porch and discharged; that Johnson was—

"* * * fumbling around with it and it kind of slipped some way. You see there was a cupboard back there, all kinds of—lots of junk back there. It was either a chair or something.

\* \* \* \* \*

"* * * It bumped there, bumped when he grabbed, like that (indicating), he grabbed for the gun, and then that's how it went off (indicating).

\* \* \* \* \*

"Q  Were you able to help him?

"A  I couldn't help him, you know, it must have hit the jugular vein * * *. You could see a big pool of blood out there when he was laying there.

"Q  And how long was it before he died * * *?

"A  * * * I would say about five minutes. * * *

"Q  * * * what were you doing?

"A  While I was there; just trying to help him you know * * *.

\*     \*     \*     \*     \*

"Q  * * * what were you thinking all the while?

\*     \*     \*     \*     \*

"A  Well, a man getting killed, were they going to blame me? * * * I was all alone; I couldn't prove it, no if there was somebody there, it would have been a different thing, but then they are not going to take my word, that's what I was thinking about.

\*     \*     \*     \*     \*

"Q  Why didn't you tell the police about this?

\*     \*     \*     \*     \*

"A  I made a mistake, I should have went right away and then it wouldn't look so bad, you know."

He testified that he then went to his home for about an hour and returned with a rope with which he dragged the body to the place where he had buried it and where it later had been found.

Other witnesses, called on defendant's behalf, testified that they had never observed any quarrel between Johnson and defendant; that on November 7, about 5 p. m., they had observed defendant and Johnson having a drink together at Doug's Tavern; and had heard no argument. One witness testified that he had observed the broken window pane on Johnson's porch long before November 7. Witnesses on behalf of the state and of defendant gave opinions as to whether the shot could or could not have been fired from outside the house.

Dr. Paul T. Grimes in rebuttal testified that he had examined Johnson's body and had found no powder burns on his face or neck, such

as would have been made had the gun been fired within 6 to 18 inches of him.

At the close of the testimony, counsel for the state requested that the court authorize the jury to view Johnson's premises. Defendant objected to this on the grounds that everything material to the issue had been submitted in evidence; and that after the shooting on November 7 many people had visited the house out of curiosity or for examination or experiments so that it probably was not in the same condition as on the night of the shooting and any misimpressions gained from such view could not be corrected by additional evidence, since both parties had rested. The court overruled this objection, and the following proceedings were then had:

"THE COURT: Jurors, the Court has decided in its discretion that you are to view the premises in question * * *.

"In doing this you must understand that you are not going out as twelve detectives or private investigators to find new evidence. Your only purpose in going out is to * * * understand the evidence that has been introduced * * *.

*     *     *     *     *

"THE COURT: Officers in charge of this jury * * *

"* * * do not permit any portion of the jury to remain alone at any time. * * * keep all persons away from the jury. Permit the jury to observe but not to experiment * * *.

*     *     *     *     *

"* * * do not talk to the jury either in your cars or going out there * * *."

After such instructions the jury and Sheriff Potter left in four cars, each driven by a deputy sheriff, to view the Johnson premises. No court reporter accompanied them to take down statements or remarks made during this trip. When the jury returned some 3 hours later, the following proceedings occurred in the presence of defendant:

"THE COURT: Anything to report? Any incident happen or anything unusual?

"THE SHERIFF: No, sir, everything went fine.

"THE COURT: Jurors have anything to report, anything unusual happen to you; anybody approach you or interfere with you in any manner?

"JURORS: No."

The jury thereafter retired and subsequently returned a verdict of guilty against defendant.

■ Defendant contends that the court erred in denying his motion to dismiss the indictment on the ground that "there existed no group or list from which a panel of Grand Jurors could legally be selected." Minn. St. 593.13, above quoted, governs selection of grand jurors. Under its provisions the Hubbard County Board of Commissioners at their annual meeting in January prepared 5 lists containing in all 86 names of qualified voters within the county as prospective grand jurors. Such names were not then transcribed to one master list and delivered to the clerk of the district court as required by § 593.13, presumably because for almost 25 years a grand jury had not been required in this county. However, it is clear that as far as the county board is concerned it recognized such names as the official 1960 list of prospective grand jurors within the provisions of § 593.13.

Thus, when the court directed the calling of a grand jury pursuant to § 628.42,[7] the auditor promptly delivered to the clerk of the district court a list of 72 names made up from such lists, certifying that they were selected from "the Grand Jury lists as prepared by the various members of the Hubbard County Board for the year 1960." While it was not signed by the chairman of the county board, it would seem that this was merely an irregularity which was corrected by his testimony as above set forth in which he verified the fact that such list was the official grand jurors' list of the county for the year in question. The subsequent selection of the 23 names to comprise the grand

---

[7]Minn. St. 628.42 provides in part: "A grand jury shall be drawn and summoned for any general term of the district court when the judge of such court shall so direct by an order made and filed with the clerk of court at least 15 days before the term begins. The judge, by an order filed with the clerk, may cause a grand jury to be drawn, summoned and convened at any time during the term."

jury by the clerk of the district court was strictly in accordance with the requirements of § 628.45.

We have held that these statutory provisions with respect to the selection of names for prospective grand jurors are directory only and that in the absence of any prejudice to a defendant substantial compliance therewith is all that is required. State v. Russell, 69 Minn. 502, 72 N. W. 832; State v. Cooley, 72 Minn. 476, 75 N. W. 729; State v. Quirk, 101 Minn. 334, 112 N. W. 409. As stated in State v. Russell, 69 Minn. 504, 72 N. W. 832:

"* * * The board of county commissioners do not draw the jury. They simply select a larger list of names from which the jury is subsequently drawn. In most of the states, jury lists are selected by such officers as judges of election, township officers, county officers, and special boards. Thompson & M. Jur. § 45. And it is generally held that the statutes regulating the selection of these lists are merely directory. Id. §§ 47, 139."

Likewise, in State v. Cooley, 72 Minn. 483, 75 N. W. 731, this court stated:

"* * * A mere irregularity in placing a qualified person on the grand jury, as by drawing the name of a person generally qualified, but who had been stricken from the jury list by a vote of the town, is not fatal to the legality of the panel."

In State v. Quirk, 101 Minn. 336, 112 N. W. 410, the court stated:

"* * * Provisions for the selection of jurors are statutory, and are generally held to be directory merely. In the face of objections, the state must show substantial compliance; but such requirements are not constitutional provisions, and there is no reason why they may not be waived by a defendant."

For the similar Federal rule, see Brookman v. United States (8 Cir.) 8 F. (2d) 803.

Based upon the decisions cited and the facts here presented, we are of the opinion that the trial court did not err in denying the motion described.

■ We are convinced that the procedure under which the jury was directed to view the premises at the close of the testimony constituted reversible error. Under § 546.12,[8] the court is authorized to order a view of premises involved in litigation so that the jury may better understand the evidence which has been submitted. We have stressed the importance of requiring that a court reporter be present during such a view so that any statements made or occurrences taking place at the time may be made a part of the record. Thus in State v. Clow, 215 Minn. 380, 386, 10 N. W. (2d) 359, 362, we stated:

"* * * In the instant case there was no stenographic record for defendant to inspect. We do not doubt that the court exercised care and caution in pointing out objects, if any were so identified, and in the remarks he made. The error, however, is in the fact that defendant had no way of knowing what was said. Though the court in a criminal case may point out and identify objects at the locus in quo to better enable the jury to understand the testimony, yet, if such is done, it is error not to provide a transcript of the proceedings for defendant's benefit and protection. Snyder v. Massachusetts, 291 U. S. 97, 54 S. Ct. 330, 78 L. ed. 674, 90 A. L. R. 575. It does not suffice to suggest that the record fails to show prejudice, since it does not appear what, if anything, was said by the court. To argue that, because the record is silent as to what was said, therefore no prejudice appears is to beg the constitutional question. The substance of defendant's right is to know what transpired during the viewing. * * *

"We conclude, therefore, that defendant's constitutional rights have been violated by the failure to provide a stenographic transcript of the proceedings at the time of viewing the locus in quo, and as a result thereof defendant is entitled to a new trial."

---

[8]Minn. St. 546.12 provides: "When the court deems it proper that the jury should view real property which is the subject of litigation, or the place where a material fact occurred, it may order them to be taken, in a body and in the custody of proper officers, to the place, which shall be shown to them by the judge, or by a person appointed by the court for that purpose; and while the jurors are thus absent, no one other than the judge or person so appointed shall speak to them on any subject connected with the trial."

See, also, State v. Rogers, 145 Minn. 303, 177 N. W. 358.

In the instant case neither the judge nor the court reporter was present during the view. Sheriff Potter who supervised the procedure had previously testified for the state, and it cannot be doubted that his testimony was vital in the case. In our opinion this procedure in effect constituted a denial of defendant's constitutional rights and requires reversal of the judgment and the granting of a new trial.

■ At the commencement of trial, defendant moved that all witnesses except defendant and law enforcement officers be sequestered. In denying this motion, in the absence of the jury, the court stated, "I do not believe that the state's witnesses are the kind that * * * could be accused as parroting at this stage of the trial." Ordinarily, in criminal cases the question of sequestration of witnesses rests in the sound discretion of the trial court, and where there is no showing that failure to sequester witnesses was prejudicial to the accused, the court's refusal to require it does not in itself constitute reversible error. State v. Quirk, 101 Minn. 334, 112 N. W. 409; Allen v. State, 98 Tex. Cr. 219, 265 S. W. 580; People v. Cooke, 292 N. Y. 185, 54 N. E. (2d) 357. However, where the evidence may be in sharp conflict on some vital issue, such as the guilt or innocence of the accused, the court should not hesitate to grant a motion for sequestration as a matter of course. Cf. Clary v. State, 68 Tex. Cr. 290, 150 S. W. 919; Music v. Commonwealth, 186 Ky. 45, 216 S. W. 116. Here, because of the vital issue at stake, it would seem that in the interests of justice defendant's motion should have been granted, and accordingly we suggest that in any retrial herein such sequestration be ordered.

■ In the early stages of the trial, the state called the prosecuting attorney, Mr. James A. Wilson, to testify as to certain measurements which he had helped to obtain and which formed the basis for diagrams of the interior of the Johnson house. They were received in evidence to demonstrate to the jury the plan of certain floors and walls, the south porch of the house, and to locate the holes left by the slug in such walls. Counsel for defendant made no objection to Mr. Wilson's testimony, but in cross-examination asked the witness:

"* * * Do you have any interest in * * * the outcome of this case?"

This was objected to on the ground that it was irrelevant. Defendant's counsel then advised the court that the question was directed at showing bias on the part of the witness, affecting his credibility. The objection was sustained, the court stating in the presence of the jury:

"* * * [H]is interest, whatever it may be, must be official and obvious to all concerned."

This court has cautioned attorneys to refrain from testifying on behalf of clients, In re Estate of Meehan, 220 Minn. 1, 18 N. W. (2d) 781; In re Estate of Cunningham, 219 Minn. 80, 17 N. W. (2d) 85; McKercher v. Vik, 199 Minn. 263, 271 N. W. 489, and has pointed out that comments or suggestions by the court reflecting on the credibility of witnesses constitute an invasion of the jury's province. City of Minneapolis v. Canterbury, 122 Minn. 301, 142 N. W. 812, 48 L. R. A. (N.S.) 842; State v. Hansen, 173 Minn. 158, 217 N. W. 146. Of course, there may be occasions when an attorney's peculiar knowledge of some fact involved in litigation makes his testimony essential in the interest of justice, Schwartz v. Wenger, 267 Minn. 40, 124 N. W. (2d) 489; State v. White, 339 Mo. 1019, 99 S. W. (2d) 72; Maund v. State, 254 Ala. 452, 48 So. (2d) 553; but where this situation is presented, cross-examination of the witness by opposing counsel to show bias or prejudice should not be curtailed; and the court should refrain from expressing its view as to the credibility of such witness. City of Minneapolis v. Canterbury, *supra*; State v. Hansen, *supra*.

■ Defendant contends that certain exhibits received over his objection should have been rejected on the ground that they were immaterial to the issue; or that they would tend to prejudice the jury against him. These exhibits consisted of (1) diagrams of the Johnson house, its interior, and the premises surrounding it; (2) photographs portraying the deceased at the time of the discovery of his body and shortly thereafter; (3) certain personal articles or personal property consisting of (a) the 12-gauge shotgun which caused Johnson's death; (b) the wadding and shotgun shell found near the south window of the Johnson house; and (c) the lead slug found in the Johnson house. It is always proper to submit in evidence for the inspection of the jury physical objects connected with a crime or which are the subject mat-

ter of an investigation. Zane v. Home Ins. Co. 191 Minn. 382, 254 N. W. 453; State v. Zemple, 196 Minn. 159, 264 N. W. 587. This rule extends to plans and diagrams of premises made for the purpose of trial so that the jury may more easily understand the testimony. Eichhorn v. Lundin, 172 Minn. 591, 216 N. W. 537. Photographs which are shown to be faithful representations of a subject as it existed at the time involved in the controversy likewise are admissible, McKnight v. City of Duluth, 181 Minn. 450, 232 N. W. 795; Luck v. Minneapolis St. Ry. Co. 191 Minn. 503, 254 N. W. 609; Moeller v. Hauser, 237 Minn. 368, 54 N. W. (2d) 639, 57 A. L. R. (2d) 364, and this rule has been held to include photographs of a decedent's body in a murder prosecution. State v. DeZeler, 230 Minn. 39, 41 N. W. (2d) 313, 15 A. L. R. (2d) 1137. Here we find no error in the court's admission in evidence of the items above described.

■ Defendant contends the court erred in receiving an original typewritten statement signed by him on November 12, 1960, wherein he described the way Johnson had met death through the accidental discharge of the shotgun. In his testimony he admitted the truth of the statement, but objected to its reception on the ground that the copy had not been signed by him when it was delivered to him on November 12. The record here, however, discloses that all requirements of § 611.033 relied upon by defendant were fully complied with. It establishes that defendant had read the original typewritten statement received in evidence; that he had initialed corrections thereon; and that he then had signed it and acknowledged thereon his receipt of a copy. It is true that this copy did not have his signature upon it, but there is no requirement to such effect in § 611.033. Certainly there was nothing to stop him from signing it once it came into his possession. This assignment in our judgment is frivolous.

■ Sheriff Potter testified as to an oral admission of guilt made to him by defendant on November 26, 1960. His testimony with respect thereto was received in evidence without objection as relating to an admission by defendant against his interest. Included in Potter's testimony was a verbatim statement of such admission. Defendant, in his testimony, emphatically denied making it. The record discloses that on

November 26 he had been in custody approximately 17 days; had not been taken before any magistrate for a preliminary hearing pursuant to § 629.14;[9] and that he had been without legal counsel up to that time. Sheriff Potter testified that on this occasion defendant has been asked to sign a written statement containing his oral admissions of guilt, but that he had refused to do so.

In a number of recent decisions, the United States Supreme Court has rejected as involuntary confessions made under somewhat similar circumstances, Reck v. Pate, 367 U. S. 433, 81 S. Ct. 1541, 6 L. ed. (2d) 948; Spano v. New York, 360 U. S. 315, 79 S. Ct. 1202, 3 L. ed. (2d) 1265; Rogers v. Richmond, 365 U. S. 534, 81 S. Ct. 735, 5 L. ed. (2d) 760; Payne v. Arkansas, 356 U. S. 560, 78 S. Ct. 844, 2 L. ed. (2d) 975; Culombe v. Connecticut, 367 U. S. 568, 81 S. Ct. 1860, 6 L. ed. (2d) 1037; Haynes v. Washington, 373 U. S. 503, 83 S. Ct. 1336, 10 L. ed. (2d) 513, and accordingly at the retrial of this case care should be exercised to apply the principles governing the admissibility of confessions of this kind in the light of the evidence which may be then presented on this question. See, Kamisar, *What is an "Involuntary" Confession?*, 17 Rutgers L. Rev. 728. See, also, Kamisar and Choper, *The Right to Counsel in Minnesota: Some Field Findings and Legal-Policy Observations,* 48 Minn. L. Rev. 1.

Defendant has made a number of additional assignments of error which do not appear to be of such materiality or relevance as to require a detailed discussion. It will suffice to say that we have considered them all carefully and find nothing therein which would constitute grounds for reversal.

Reversed and new trial ordered.

---

[9]Minn. St. 629.14 provides: "The arrest of a person may be lawfully made also by any peace officer or a private person, without a warrant upon reasonable information that the accused stands charged in the courts of a state with a crime punishable by death or imprisonment for a term exceeding one year, but when so arrested the accused must be taken before a judge or magistrate with all practicable speed and complaint must be made against him under oath setting forth the ground for the arrest as in section 629.13; and thereafter his answer shall be heard as if he had been arrested on a warrant."