# STATE v. NORMAN J. MASTRIAN.*

171 N. W. (2d) 695.

October 17, 1969—Nos. 39499, 39752.

---

* Certiorari denied by the United States Supreme Court April 20, 1970.

*Douglas W. Thomson, John A. Cochrane, John R. Wylde, Jr.,* and *Jack S. Nordby,* for appellant.

*Douglas M. Head,* Attorney General, *Richard H. Kyle,* Solicitor General, *William B. Randall,* County Attorney, and *Thomas M. Quayle,* Assistant County Attorney, for respondent.

ROGOSHESKE, JUSTICE.

Defendant was convicted by a jury after trial in Duluth, St. Louis County, of murder in the first degree. The conviction resulted from the brutal murder of Carol Thompson in St. Paul, Ramsey County, on March 6, 1963, admittedly by one Dick W. C. Anderson, as previously described in complete detail in State v. Thompson, 273 Minn. 1, 139 N. W. (2d) 490, certiorari denied, 385 U. S. 817, 87 S. Ct. 39, 17 L. ed. (2d) 56. In that case, the conviction of decedent's husband, T. Eugene Thompson, of first-degree murder resulting from the same homicide upon essentially similar evidence was reviewed and affirmed.

Defendant appeals from orders of the trial court denying his post-trial motions for judgment of acquittal or for a new trial, for arrest of judgment, and for a new trial upon the ground of newly discovered evidence, and also from the judgment of conviction.

In a most comprehensive, detailed, and penetrating brief submitted by defense counsel, defendant raises 21 legal issues challenging, singularly and collectively, what appears to be every

arguable imperfection of the proceeding resulting in his conviction and sentence to life imprisonment, and from which it is vigorously urged that we must either reverse the judgment of conviction or at the very least grant a new trial. We are not persuaded that such relief is justified and accordingly affirm defendant's conviction.

In adherence to our obligations to vindicate any denial of substantial rights of persons accused of a crime punishable by loss of liberty and to prevent manifest injustice without regard to the gravity of the offense or the persuasiveness of the proof of guilt, we have painstakingly examined the entire record and carefully considered each and all of defendant's claims. The significant legal issues raised will be considered separately.

### Validity of arrest

On April 19, 1963, at 3 a. m., about a month and a half after the murder, several St. Paul police officers, proceeding without an arrest warrant, went to defendant's home in Spring Lake Park, Anoka County, to arrest him. After identifying themselves and their purpose, and when defendant failed to come out, they broke in the door of his home and arrested him. Although a complaint was filed in the St. Paul municipal court following defendant's arrest, no attempt was made to procure an arrest warrant and no claim is made that defendant had escaped or was about to flee the jurisdiction of the arresting officers.

While we have no reason to doubt that the officers were acting honestly to take into custody one who they in good faith believed had participated in a brutal, premeditated murder, we are compelled to agree with defendant that his arrest was illegal and that the municipal court of St. Paul, upon defendant's special appearance challenging the legality of his arrest, erred in refusing to invalidate it.

Apart from the doubtful authority of the officers under Minn. St. 629.40 to make an arrest outside the boundaries of the city of St. Paul of one who had neither escaped from their custody

nor was fleeing their jurisdiction,[1] the invalidity of the arrest rests essentially upon the state's failure to establish that the arresting officers had probable cause to believe that defendant had committed a felony. This is a necessary statutory and constitutional prerequisite to a warrantless arrest.[2] At the hearing on defendant's motion challenging personal jurisdiction, the defendant called the police officer who ordered the arrest to testify. In attempting to inquire into the factual basis for his conclusion that there was reasonable or probable cause to believe that de-

---

[1] Minn. St. 629.40 provides: "Subdivision 1. In any case wherein any sheriff, deputy sheriff, police officer, marshal, constable, or peace officer may by law, either with or without a warrant, arrest any person for or upon a charge of any criminal offense committed within his jurisdiction, and the person to be arrested escapes from or is out of the county, city, town, or village, the officer may pursue and apprehend the person to be arrested anywhere in this state.

"Subd. 2. When any sheriff, deputy sheriff, police officer, marshal, constable, or peace officer shall, in obedience to the order of a court, or proper police authority, or in fresh pursuit as provided in subdivision 1, be outside of his jurisdiction he is serving in his regular line of duty as fully as though he was within his jurisdiction."

[2] § 629.34 provides: "A peace officer may, without warrant, arrest a person:

"(1) For a public offense committed or attempted in his presence;

"(2) When the person arrested has committed a felony, although not in his presence;

"(3) When a felony has in fact been committed, and he has reasonable cause for believing the person arrested to have committed it; or

"(4) Upon a charge made upon reasonable cause of the commission of a felony by the person arrested.

"To make such arrest the officer may break open an outer or inner door or window of a dwelling house if, after notice of his office and purpose, he shall be refused admittance."

The standard of reasonable cause set forth in § 629.34(3) is synonymous with the constitutional requirement of probable cause to support an arrest. State v. Harrison, 279 Minn. 310, 156 N. W. (2d) 763; State v. Purdy, 278 Minn. 133, 153 N. W. (2d) 254; State v. Sorenson, 270 Minn. 186, 134 N. W. (2d) 115.

fendant had participated in the murder, he received answers which were general and conclusory. The officer stated only that he had probable cause to believe defendant committed the offense and that this belief was based on police sources. The evidence was clearly insufficient under the cases to establish probable cause for the arrest. See, Beck v. Ohio, 379 U. S. 89, 85 S. Ct. 223, 13 L. ed. (2d) 142.

Nevertheless, the municipal court ruled, and defense counsel then representing defendant conceded, that defendant had the burden of proving that there was no probable cause for the arrest, and that defendant failed to carry this burden. This was clearly erroneous. Any arrest made without a warrant, if challenged by the defendant, is presumptively invalid, and the burden is upon the state to justify it as one not only authorized by § 629.34 but also as one not violative of the guarantee of the Fourth Amendment to the United States Constitution against any invasion of privacy except upon a showing of probable cause. Giordenello v. United States, 357 U. S. 480, 78 S. Ct. 1245, 2 L. ed. (2d) 1503; McDonald v. United States, 335 U. S. 451, 69 S. Ct. 191, 93 L. ed. 153. The defendant cannot be put to the proof of the negative that the police did not have a statutory ground to support the arrest and did not have knowledge of facts sufficient to support a judicial finding that probable cause for the arrest existed. In order to validate the arrest in this case, it was incumbent upon the state to present to the municipal court the factual information and sources thereof which led the police to conclude that there was probable cause to believe that defendant had participated in the murder when they arrested him. The quantum and quality of proof required was recently outlined in State v. Burch, 284 Minn. 300, 170 N. W. (2d) 543. Even though the state may have been able to supply such proof, a forcible nighttime intrusion into a dwelling house where no reason appears why an arrest warrant could not have been sought must be condemned as inconsistent with Fourth Amendment rights and fraught with grave danger of prejudicial error requiring

retrials of otherwise valid convictions. As we cautioned in State v. Harris, 265 Minn. 260, 121 N. W. (2d) 327, and reemphasized in State v. Grunau, 273 Minn. 315, 144 N. W. (2d) 815, a felony arrest and search should not be made without a warrant unless there is a compelling necessity to do so.

The disposition of this issue, however, is controlled by State v. Burch, *supra,* where, in addition to detailing the proper method of challenging an adverse jurisdictional finding by the trial court, we held that where the constitutional error in the arrest results in no prejudice to a determination of defendant's guilt on the merits, a new trial is not required. After reviewing the cases, we concluded (284 Minn. 310, 170 N. W. [2d] 551):

"* * * Where a defendant is present in a court having jurisdiction over the offense with which he is charged, has entered a plea, and is defending on the merits, we believe it wholly illogical to say that the court lacks jurisdiction to determine his guilt or innocence solely because there was a defect in the procedure under which he was initially brought into court."

See, also, State ex rel. Duhn v. Tahash, 275 Minn. 377, 147 N. W. (2d) 382; State ex rel. Adams v. Rigg, 252 Minn. 283, 89 N. W. (2d) 898, certiorari denied, 358 U. S. 899, 79 S. Ct. 224, 3 L. ed. (2d) 149.

In the cases cited by defendant where an invalid arrest was followed by warrantless search resulting in the discovery of incriminating evidence which was later introduced at trial, the invalidity of the arrest rendered the search invalid and the evidence obtained inadmissible, thereby entitling defendant to reversal of his conviction. Here, however, no such evidence was introduced at trial. In addition, in our careful examination of the record in the light of defendant's claims of prejudice, we are not persuaded that any other potentially prejudicial effect, as listed in State v. Burch, *supra,* resulted from defendant's illegal ar-

rest.[3] Thus, despite the illegality of defendant's arrest, we conclude that a new trial is not warranted on this ground.

### Preliminary hearing

Following defendant's arrest and the hearing challenging its validity, defendant made a timely request for a preliminary hearing, which was set for May 13, 1963. Before that date, the grand jury indicted defendant for the crime of murder in the first degree, and the preliminary hearing was never held. Defendant contends that the failure to afford him a preliminary hearing, provided by statute for the purpose of determining whether there is probable cause to hold an accused in custody, was error, especially in view of the totality of the circumstances, including "excessive bail," the court's ruling foreclosing his inquiry into probable cause upon his special appearance, and claimed unjustified denial of pretrial discovery. Our disposition of this issue is controlled by State v. Mitchell, 282 Minn. 113, 163 N. W. (2d) 310, where we pointed out that a grand jury indictment is mandatory in this state where the charge is to be murder in the first degree, and the county attorney has no choice but to seek an indictment. We also directly held that when the accusation is by indictment no preliminary hearing is required and that the intervening indictment renders defendant's request for such a hearing moot and is not violative of due-process or equal-protection rights. Contrary to suggestions incorporated in defendant's argument, we find no support whatsoever for a claim that the prosecution, by design or tactical maneuver, sought the indictment for the purpose of mooting the preliminary hearing—conduct which today would have to be viewed as creating grave dangers of prejudice to one pursuing his fundamental right to challenge probable cause for his detention.

---

[3] E. g., inability to contact witnesses due to incarceration, destruction of evidence which would tend to negate guilt, or admission of incriminating statements made to police while in custody.

## Sufficiency of indictment

Defendant argues that the indictment returned against him by the Ramsey County grand jury was deficient in that (1) the statutory method by which the grand jury was selected is unconstitutional; (2) there were material deviations from the statutory procedures in the calling, composition, and conduct of the grand jury; and (3) the indictment itself was not adequate to inform defendant of the precise offense with which he was charged.

Minn. St. 593.14 provides that in Ramsey County a majority of the judges of the district court shall meet annually in December and select 125 persons properly qualified to serve as grand jurors, from which the clerk is to draw at random the names of the grand jurors to serve during the next year. Defendant's contention that this is a "key man" system of selection which discriminates against the middle and lower socioeconomic groups in our society in violation of the due-process and equal-protection clauses of the State and Federal Constitutions is answered by our repeated holdings that this selection procedure is not constitutionally invalid. State v. Mitchell, *supra;* State v. Dilliard, 279 Minn. 414, 157 N. W. (2d) 75.

The grand jury which indicted defendant was drawn in January 1963 from a list prepared in December 1961, since no new list of names had been submitted by the district judges in December 1962. Only 60 names remained on the list when this grand jury was selected, and some of these may have been duplications. Defendant contends, therefore, that the indictment returned was fatally defective. However, § 593.14, subd. 1, explicitly provides that "[i]f, in any year, such selection and lists shall not be made in the month of December, the same may be done at any time thereafter that any judge of that court may designate" and that "[t]he validity or legality of such selection or lists shall not be affected * * * by the selection of a greater or less number of persons than as specified in this section." Thus, the statute itself

permits some deviation in the time of selection of the master list and the number of persons included on it.

It is also clear that the provisions of § 593.14 are merely directory and that, in the absence of prejudice, minor irregularities are not grounds for quashing the indictment or reversing a conviction procured pursuant thereto. State v. Garden, 267 Minn. 97, 125 N. W. (2d) 591. While it may be, as defendant argues, that a 5-month delay in submission of a new master list and a selection of a grand jury from an old list containing less than one-half of the number of names specified by the statute are more than minor, immaterial irregularities, we cannot agree from our view of the record as a whole that any of his substantial rights were in any way prejudiced by these defects.

Defendant contends that the county attorney's admission that he tape-recorded selected testimony of witnesses who appeared before the grand jury when it was considering the indictment against defendant reveals such a material violation of the statute which protects the secrecy of grand jury proceedings that the trial court erred in refusing to quash the indictment returned. We do not agree.

Although § 628.04 specifically requires the grand jury to return a transcript of the testimony to the trial court if it makes a presentment, § 628.57 provides that the grand jury—

"* * * shall preserve the minutes of its proceedings, but not of the votes of the individual members on a presentment or indictment, *or of the evidence given before them.*" (Italics supplied.)

Thus, no minutes or record of the testimony may be preserved when an indictment is returned. The county attorney may be present during the testimony before the grand jury,[4] but there is no statutory authority for him to invade the grand jury room with a tape recorder, record selected testimony, and remove the tapes for his own use.

The trial court refused to require a pretrial disclosure to de-

---

[4] § 628.63.

fendant of the tape recordings in his attempt to establish that the indictment returned against him was based on "incompetent, insufficient, and illegal evidence." While many jurisdictions have, either by statute or by rule, lifted the veil of secrecy from testimony before the grand jury and even have required that the defendant be given a copy of it as a matter of course, our statutes still jealously guard the secrecy of the grand jury room. Given this statutorily imposed secrecy, it is always very difficult to prove that an indictment was not based on legal evidence. State v. Thompson, *supra.* The determination of whether defendant has proved this or not is vested in the trial court. While we believe the trial court could properly have examined the tapes in camera and required the county attorney to supply defendant with a copy of the improperly taped testimony as an aid to determine defendant's motion to quash the indictment, defendant has not in any way shown or even suggested how any substantial right of his was, or could have been, prejudiced by the making of these tape recordings.[5] Thus, while we express our disapproval of this violation of the secrecy of the grand jury proceedings and our disagreement with the court's application of the statute, we find no reversible error.

The indictment returned against defendant charged that he—

"* * * with a premeditated design * * * did kill and murder * * * Carol Thompson by means of * * * a gun * * * by striking and beating the said Carol Thompson with said gun, and by means of a * * * knife * * * by then and there stabbing the said Carol Thompson with said knife * * *."

Section 628.18 provides that to be sufficient an indictment must clearly and distinctly set forth the act charged constituting the offense in ordinary and concise language with such a degree

[5] If defendant believed that any witness gave testimony before the grand jury which was inconsistent with his testimony at trial, § 628.65 authorizes calling any grand juror as a witness to disclose for impeachment purposes the testimony which was given by that witness before the grand jury.

of certainty that a court will be able to pronounce judgment according to law upon a conviction. The indictment returned against defendant, although not specific as to the alleged role of defendant, did conform to these standards and adequately informed defendant that he was being charged with the crime of the first-degree murder of Mrs. Thompson under Minn. St. 1961, § 619.07.

The indictments against Anderson and Thompson were couched in the same language, even though their alleged roles and degree of physical participation in the murder were very different.[6] This undoubtedly provoked defendant to move for an order requiring the state to furnish a bill of particulars outlining in detail the specific acts which he was accused of committing. In response to this motion, the trial court ordered the state to inform defendant as to (1) the location of the alleged crime, (2) whether it contended that defendant was physically present and/or physically participated in the alleged attack on Mrs. Thompson, and (3) whether "the State contends that this defendant either (*and without specifying*) aided and abetted, directly or indirectly counseled, encouraged, hired, commanded, induced, or otherwise procured another to commit the alleged crime of murder." (Italics supplied.) The state complied with this order explicitly. Defendant, however, objects to the simple affirmative answer given to the third of these inquiries and unsuccessfully moved that the prosecution be forced to state precisely which one of these acts it was accusing the defendant of committing and to try defendant upon it alone. The state's answer was in strict compliance with the court's order and clearly and adequately informed defendant that he was being charged with in some manner procuring someone to kill Mrs. Thompson. Under the circumstances of the case, we have no doubt that defendant was neither confused or misled concerning

---

[6] See, State v. Thompson, 273 Minn. 1, 139 N. W. (2d) 490, certiorari denied, 385 U. S. 817, 87 S. Ct. 39, 17 L. ed. (2d) 56.

the offense charged nor insufficiently informed to prepare his defense, even though we fail to understand why, applying modern concepts of criminal justice, the state should not have simply and straightforwardly informed defendant that he was accused of hiring Anderson to kill Mrs. Thompson.

### Excessive bail

Defendant's contention that the trial court denied him equal protection of the law by refusing to reduce the $100,000 bail set for him, since he was unable to meet it while one defendant identically charged was able to post bail, was disposed of adversely to him in State v. Mastrian, 266 Minn. 58, 122 N. W. (2d) 621, certiorari denied, 375 U. S. 942, 84 S. Ct. 349, 11 L. ed. (2d) 274, and in Mastrian v. Hedman (8 Cir.) 326 F. (2d) 708, certiorari denied, 376 U. S. 965, 84 S. Ct. 1128, 11 L. ed. (2d) 982. The proceedings resulting in conviction do not reveal any new facts or changed circumstances which would justify altering that result.

### Discovery

Defendant made a pretrial motion for an order directing the state to produce for inspection by defendant all statements of witnesses, material used to refresh witnesses' recollection, the notes, memoranda, and reports of investigating officers, all tangible evidence seized or prepared for trial, and other information and material involving the crime which the state had in its possession. This motion was denied.

It has long been our rule that a criminal defendant cannot compel the state to permit him to examine the evidence against him prior to trial. State ex rel. Robertson v. Steele, 117 Minn. 384, 135 N. W. 1128.

It is true that in a growing number of jurisdictions there has been movement toward open, free, and total pretrial discovery in criminal cases similar to that provided for in civil cases by the Rules of Civil Procedure. To adopt unqualified discovery, as urged by defendant, and to base a reversal thereon would be

unjustified. Such a substantial change in our long-established procedures should, we believe, be accomplished only by statute or by rules of court after a long and detailed consideration of the many policy considerations involved. See, generally, Louisell, *Criminal Discovery: Dilemma Real or Apparent?*, 49 Calif. L. Rev. 56.

In recognition of the trend toward discovery, we did adopt in State v. Thompson, *supra*, the so-called "Jencks rule," which requires the state to permit the defense, after a prosecution witness has testified, to examine such parts of pretrial statements made by that witness as are relevant to his testimony in order to determine their value for impeachment purposes.

Defendant specifically objects to the refusal of the trial court to order the state to produce the stenographic transcript of an oral pretrial statement made in response to questions propounded by the county attorney to prosecution witness Margaret Johnson. In State v. Grunau, *supra*, we pointed out that the only pretrial statements which the prosecution will be compelled to produce for inspection in situations such as these are (1) a written statement made and signed or otherwise approved by the witness, or (2) a stenographically, mechanically, or electronically recorded, substantially verbatim recital of an oral statement made by the witness to an agent of the state. It is clear that Margaret Johnson never signed or otherwise approved of the statement taken from her. In fact, she never even saw a copy of it.

While it might be reasonable to assume, as defendant argues, that when a stenographer is called in during the questioning of a witness, the stenographer will make a verbatim record of the witness' answers, defendant failed to establish, by calling the stenographer or otherwise, that the statement which was taken was in fact a substantially verbatim recording.

Defendant also argues that since the foreman of the grand jury dictated the grand jury "minutes" (required to be preserved in writing by Minn. St. 628.57) to his secretary, who was not a member of the grand jury, the secrecy of the grand jury proceed-

ings was destroyed, so that the trial court should have granted his request for a copy or an in-camera inspection of them. The administrative and clerical employees of the grand jury, just as the administrative and clerical employees of any court, are privy to all sorts of confidential information without its becoming a matter of public record or available to all those who seek it. Clearly, it was not error for the trial court to refuse to order the state to produce the grand jury's minutes.

*Petit jury*

Before trial, and after venue was transferred to St. Louis County, defendant made a timely challenge to the entire jury panel pursuant to Minn. St. 631.23 on the ground that there had been material departures from the forms provided by § 593.14 for the drawing of the panel. The jury list from which the panel was selected was drawn up in November (rather than in December) from those who voted in a previous election (rather than from all qualified electors) by data-processing equipment (rather than by the district judges) and was made up of 5,000 (rather than 2,000) prospective jurors.[7] While all of these represent unexcused variations from the jury selection procedure set out by the legislature in § 593.14, we believe that they are not material deviations (State v. Garden, *supra*) and did not in any way prejudice defendant or deprive him of a fair and impartial jury trial.

Defendant also complains that the state was permitted to exercise a peremptory challenge to a juror after all 12 regular jurors were sworn even though (1) no challenge for cause was interposed by either party, and (2) defendant had not been permitted to exercise a peremptory challenge to any individual juror once that juror had been turned over to the prosecution for questioning. The state justified its late peremptory challenge by showing that the juror in question had misrepresented his edu-

---

[7] Section 593.14 expressly provides that the validity of the list is not affected by the selection of a greater number than provided for.

cational background and arrest record, and that the juror had visited his son who was incarcerated in the same jail as defendant. If the challenge was timely, there is no question that the trial court had the power to grant it even though the triers had found no actual bias. State v. Lupino, 268 Minn. 344, 129 N. W. (2d) 294. Section 631.26 provides that a peremptory challenge "shall be taken when the juror appears, and before he is sworn; but the court, for good cause, may permit it to be taken after he is sworn, and *before the jury is completed*." (Italics supplied.) Thus, the trial court had the power to permit the state to exercise a peremptory challenge so long as the jury was not "completed."

The state contends that a jury is not "completed" until the number of alternates designated by the court to serve in the case have been sworn. Defendant argues that the jury is "completed" when the twelfth regular member is sworn, citing § 593.01, which defines a petit jury as "a body of 12 men or women, or both," and § 546.095, which authorizes a trial court to call alternate jurors "after the jury is impaneled and sworn." However, the latter section is probably inapplicable since c. 546, of which it is a part, seems to deal only with the trial of civil cases, and to that extent § 546.095 has been superseded by Rule 47.02, Rules of Civil Procedure.[8] There is no corresponding statutory provision governing the use of alternate jurors in criminal cases. While it is clear that the trial court had the inherent power to impanel alternate jurors, we do not believe that they are a part of the jury for the purposes of § 631.26. The jury is completed when the 12 regular jurors are sworn. Thus, the trial court erred in permitting the state to exercise a peremptory challenge thereafter. However, defendant has not pointed out,

---

[8] Rule 47.02, Rules of Civil Procedure, treats "jurors" and alternate jurors as two separate classes, and provides that the parties shall have one and only one peremptory challenge during the selection of the alternates and that this challenge can only be used against a prospective alternate juror.

and we cannot see, how he was or could have been prejudiced by what surely must be viewed as harmless error.

*Sufficiency of the evidence to sustain the conviction*

Emphasizing this as a particularly significant issue on oral argument, especially in the light of post-trial developments giving rise to the issue of a claimed erroneous denial of a new trial upon the ground of newly discovered evidence (treated later), defendant argues:

"The failure of the State to present a case in chief pointing unerringly to guilt, plus the impeachment of the State's case by cross-examination and by defense witnesses, the presentation of the affirmative alibi defense by unimpeached witnesses and the establishment of the alternate theory of a daylight burglary, created reasonable doubt as a matter of law and it was error to refuse to direct a verdict for Appellant at the close of the State's case, at the close of the defense, or at the close of all the evidence, and to deny the motions for a judgment of acquittal, a new trial, or an arrest of judgment."

In our view, this argument simply is not supported by a fair and impartial reading of the record. Bearing in mind the rules governing a reviewing court's determination of this issue on appeal so well summarized in State v. Thompson, *supra,* we experience no difficulty in reaching the conclusion that there is ample evidence to support the conviction.

In view of defendant's judicial admission at the commencement of the trial that Mrs. Thompson was murdered in the manner described by the indictment, the pivotal fact issue confronting the jury was whether the state had met its burden to prove beyond a reasonable doubt that defendant in fact, in the language of the bill of particulars and the instructions of the court, directly or indirectly counseled, encouraged, hired, commanded, induced, or otherwise procured Anderson to commit the crime. As detailed in the Thompson opinion, Anderson testified directly that he was hired by defendant as well as instructed as

to the time, place, and manner of accomplishing the murder, and that defendant paid him money before and after he committed the crime. As the confessed murderer who was indicted and subject to punishment for the same crime as that charged against defendant, Anderson's role as a prosecution witness was that of an accomplice-informer. State v. Smith, 264 Minn. 307, 119 N. W. (2d) 838. As such, he was legally competent to testify;[9] but, unlike some jurisdictions, defendant's conviction, as the jury was instructed pursuant to § 634.04, could not be based upon Anderson's uncorroborated testimony.[10] Under this long-existing statutory rule, it is not enough merely to caution a jury that an accomplice's testimony should be carefully scrutinized and weighed with care, but the jury must be told that they cannot accept the testimony of an accomplice unless it is corroborated by other independent evidence. Except for certain gambling offenses, our statute, as interpreted and applied, requires other direct or circumstantial evidence which, although not of sufficient weight to make out a prima facie case of guilt, tends in some substantial degree to affirm the truth of the accomplice's testimony and to point to the defendant's guilt. State v. Eliason, 279 Minn. 70, 155 N. W. (2d) 465; State v. Armstrong, 257 Minn. 295, 101 N. W. (2d) 398. As summarized in State v. Mathiasen, 267 Minn. 393, 127 N. W. (2d) 534, the kinds of evidence which may supply needed corroboration include defendant's possession of instruments used in the commission of the crime; suspicious, unusual, or unexplained conduct of the defendant before or after the crime; testimony of incriminating admissions made by defendant of participating in preparations for the crime; defendant's acquaintance or association with those actively or passively involved in the crime under circumstances which suggest joint participation; opportunity and motive; and unexplained affluence or possession of the fruits of criminal conduct.

---

[9] § 595.07.

[10] See, 2 Wright, Federal Practice and Procedure, §§ 405 and 490.

We deem it unnecessary to demonstrate by a recital of the evidence that the rule requiring corroboration was satisfied. It is sufficient to point out that in the evidence relating to the pistol, the hose, and the transfer of money from Thompson to defendant following the murder, and the testimony of defendant's solicitation of Anderson and others to commit the crime as related by prosecution witnesses Sheldon Morris, Willard Ingram, Henry Butler, and Richard Sharp, can be found the needed corroboration. Even though the testimony of those witnesses could have been utterly rejected by the jury in view of their admitted criminal activities, the inconsistencies in their testimony, and the natural reaction of contempt and aversion to them as informers and passive participants in varying degrees to defendant's hiring of Anderson, the credibility of their and Anderson's testimony and the persuasive force of the evidence relating to defendant's alibi was for the jury. It is neither inconceivable nor contrary to human experience that criminals can, and often do, inform against and supply evidence necessary to convict other criminals. In our opinion, the jury was fully justified in accepting their testimony as essentially true and sufficiently persuasive to permit the jury to reach an abiding conviction that the charge against defendant was established by proof beyond a reasonable doubt.

## Publicity

Defendant appears to concede that by granting his motion for a change of venue to St. Louis County, the Ramsey County District Court did as much as it could to protect him from any adverse effects of the massive, often improper, nationwide pretrial publicity which this and the Thompson case received. However, defendant does claim that since the massive publicity continued unabated throughout the trial, the trial court should have granted his motion made at the outset of the trial to sequester the previously unbiased jurors in order to shield them from the anticipated continuing publicity during the course of the trial. Although the record and defendant's argument convincingly

demonstrate the existence of prejudicial pretrial publicity, there is scant proof that the jurors selected continued to be exposed to the same type of publicity or that the trial publicity was so unfavorable to the accused that the jurors could not realistically be expected to remain impartial. The state's position with respect to defendant's motion was that the cost and inconvenience of sequestration for a long, complicated trial such as this rendered sequestration highly impractical, if not impossible.

In the usual case, the question of whether the jury should be sequestered is left to the sound discretion of the trial court. Koolish v. United States (8 Cir.) 340 F. (2d) 513. The trial judge, however, is fully justified in sequestering the jury, whatever the cost or inconvenience, if, in the face of great notoriety and unrestrained reporting by the news media, sequestration seems necessary to protect the defendant's right to a fair and impartial trial. Thus, in widely publicized or sensational cases where there is grave danger that highly prejudicial matters will come to the attention of the jury, the court, on motion of either party, should order sequestration. The extremely high cost to both the defendant and the state of retrying the case if on appeal sequestration is found to have been necessary clearly weighs heavily in favor of incurring the lesser cost of sequestration. Sheppard v. Maxwell, 384 U. S. 333, 86 S. Ct. 1507, 16 L. ed. (2d) 600; A. B. A. Project on Minimum Standards for Criminal Justice, Standards Relating to Fair Trial and Free Press (approved draft, 1968) § 3.5 and commentary.

This case was tried before the impact of the Sheppard case and the A. B. A. Fair Trial and Free Press Standards provoked development of new guidelines for the exercise of the court's power to order sequestration of the jury during trial.[11] In spite of this, we have the impression from the record that the trial judge might have granted the defendant's motion to sequester the jury, had not the state interposed strong objections.

---

[11] See, Report of the Judicial Conference Committee on the Operation of the Jury System on the "Free Press-Fair Trial" Issue, September 1968.

Unfortunately, the effects of this objection and the court's refusal to sequester were compounded by the trial court's disclosure to the jury that it was the defendant who sought to have them locked up during the trial, contrary to the A. B. A. Standards and the suggested guidelines of the Judicial Conference committee dealing with this subject—which, it must be emphasized, had not been published at the time defendant's motion was made and denied.

Since, however, we are not convinced that the pervasive, prejudicial pretrial publicity denied defendant a fair trial, we cannot believe that any further publicity during the trial could have improperly influenced these jurors. Even though meaningful guidelines for shielding juries from prejudicial publicity were unavailable at the time this case was tried, the trial judge gave a carefully and artfully phrased cautionary instruction to the jury to ignore any publicity which they might encounter during the trial.[12] There was certainly none of the circus atmosphere in the courtroom such as prevailed during the trial in Sheppard v. Maxwell, *supra*. As in State v. Thompson, *supra*, given the nature of the case and the time of the trial, we believe that virtually everything that could have been done to protect defendant's right to a fair and impartial trial was done, and therefore we do not regard denying sequestration as reversible error.

### Improper closing argument

Defendant objects to the prosecutor's reference to him in his closing argument as a "merchant of murder." In order to entitle defendant to a new trial, the alleged misconduct of the prosecutor in his summation must be so prejudicial that it resulted in a denial to the defendant of his right to a fair and impartial trial. State v. Jones, 277 Minn. 174, 153 N. W. (2d) 67.

It is clear that the prosecutor may not, in closing argument, express his personal opinion upon the guilt of the defendant and

---

[12] See, A. B. A. Project on Minimum Standards for Criminal Justice, Standards Relating to Fair Trial and Free Press (approved draft, 1968) § 3.5(e).

may not engage in argument calculated to arouse passion or prejudice in the jury, for it is the primary duty of the prosecutor to seek a just result, not simply to convict an accused. State v. Perry, 274 Minn. 1, 142 N. W. (2d) 573. However, he may argue to the jury any inference which might reasonably be drawn from the evidence in the record. Except for the fundamental that the prosecutor may not intentionally mislead the jury as to the inferences they may draw, the line between proper and improper argument in this area is a thin one.

The defendant was accused of being the middleman between the victim's husband and the hired killer in a sensational murder case. The evidence was clearly sufficient to support an inference that defendant in fact hired Anderson to murder Mrs. Thompson. Defendant did not contemporaneously object to the use of this language by the prosecutor. Under the circumstances, we are not prepared to regard the prosecutor's characterization of defendant's role in the crime as unjustified or deliberately designed to arouse prejudice in the minds of the jury. See, State v. Ellis, 271 Minn. 345, 136 N. W. (2d) 384.

It may be noted that the fact that this was the only alleged error found in the prosecutor's long and detailed closing argument by counsel for defendant in their diligent and exhaustive examination of the record is indicative of the high quality of the state's summation. Based on our careful examination of the closing argument in its entirety, we are of the view that the prosecutor should be commended for the admirable restraint which he exercised rather than condemned for his isolated use of this one phrase.

### Newly discovered evidence

As previously noted, defendant made a post-trial motion for a new trial on the ground of newly discovered evidence.

Following conviction first of Thompson and then of Mastrian, Anderson was convicted of first-degree murder upon his plea of guilty, sentenced to life imprisonment, and incarcerated in the State Prison at Stillwater. Shortly thereafter, he repudiated

under oath the testimony he had given at the trials of Thompson and defendant and completely exonerated both of them. At a hearing on Thompson's motion for a new trial based upon this repudiation, Anderson, by oral testimony before the trial court, repudiated the repudiation and in all essential details reaffirmed the version of the crime which he had related at both trials. The trial judge who presided at trial and at the hearing on the motion denied Thompson's motion for a new trial, and we affirmed upon appeal. State v. Thompson, *supra*. The presiding judge upon defendant's trial likewise denied defendant's motion because he found that Anderson's repudiation was for the most part a fabricated product of coercion and was merely impeaching. He concluded that the repudiation and subsequent reaffirmation of Anderson's trial testimony "would not lead to a different result" upon a new trial. While Anderson's chameleonic regard for the truth has been well documented, the determination of whether or not a defendant is entitled to a new trial on the basis of newly discovered evidence rests in the sound discretion of the trial judge, who is in the best position to assess not only the credibility of the witnesses appearing but to determine whether the likelihood of a different result was substantial enough to require a new trial. State v. Brehmer, 281 Minn. 156, 160 N. W. (2d) 669; State v. Klotter, 274 Minn. 58, 142 N. W. (2d) 568. Since the trial judge applied the proper rule in considering the motion and we find no abuse in the exercise of his discretion, we defer to his determination.

Defendant also argues that he can now prove that the testimony of Morris, Sharp, Ingram, and Butler was false and was induced by improper prosecutorial promises of leniency which he alleges have been fulfilled since the trial. However, the only fact which defendant presented in support of his motion for a new trial on this ground was that, while each of them was being held at the time of defendant's trial on charges which, upon conviction, carried substantial prison sentences, all of them were released shortly after defendant's trial either without being

74

prosecuted or with suspended sentences. This fact, unexplained, may understandably create some suspicion, especially in the mind of defendant, but it is wholly insufficient to support an allegation, much less an evidential inference, that the prosecution permitted any of these witnesses to deny that any promises or inducements were offered when the prosecution knew such denials were false. Moreover, the disposition of the cases can hardly be viewed as newly discovered evidence requiring a new trial. As we have pointed out on a number of occasions, mere allegations unsupported by the record, no matter how serious, are not enough to warrant a reversal upon a direct appeal. E. g., State v. Gilles, 279 Minn. 363, 157 N. W. (2d) 64. If defendant has any evidence to support his allegation of false testimony, he is not foreclosed from seeking postconviction relief under Minn. St. 590.01, et seq.

### Electronic surveillance

Application of the same rule disposes of defendant's allegation that much of the evidence against him was obtained directly or indirectly by use of illegal telephone wire tapping and electronic surveillance, allegations which in our opinion are wholly devoid of support in the record.

### Delay in transcript

Defendant argues that his constitutional rights to due process of law and equal protection of the law were denied because it took 3 years for him to obtain a complete transcript of all of the proceedings below for the purpose of preparing this appeal (allegedly because he was indigent) while Thompson (who had sufficient funds) obtained a transcript of his trial within 1 year. We are not persuaded to depart from our decision that this 3-year delay, while regrettably long, was fully explained and did not deprive defendant of his fundamental rights. State ex rel. Mastrian v. Tahash, 277 Minn. 309, 152 N. W. (2d) 786.

### Totality of circumstances

Defendant's final argument, eloquently expressed by defense

counsel, is that even if it should be found that no single error is sufficient to require a new trial, "the conspectus of the proceedings" does because, to summarize, the cumulative effect of the claimed errors alleged, as well as sustained, so substantially influenced defendant's conviction as to deny him due process of law.

In addressing ourselves to this argument, we are fully mindful of our duty to enforce contemporary standards of fairness to the end that no conviction may be sought or obtained by methods regarded as repugnant to basic values protected by constitutional requirements.

We are also mindful that it is not our function to determine guilt or innocence;[13] that the fact that we have found defendant's conviction supported by sufficient competent evidence is not decisive;[14] that if the errors are sufficiently serious to affect substantial rights, a reversal is required even though we are "without doubt" concerning defendant's guilt;[15] and that "[e]ven those guilty of the most heinous offenses are entitled to a fair trial."[16] However, "[a] defendant is entitled to a fair trial but not a perfect one,"[17] and "justice, though due to the accused, is due to the accuser also."[18] Because of human involvement, no criminal proceeding disposed of by a trial is likely to be completely free of defects, irregularities, or errors. Only those of such character as prejudice substantial rights justify granting

---

[13] Bumper v. North Carolina, 391 U. S. 543, 88 S. Ct. 1788, 20 L. ed. (2d) 797.

[14] Kotteakos v. United States, 328 U. S. 750, 66 S. Ct. 1239, 90 L. ed. 1557.

[15] Bollenbach v. United States, 326 U. S. 607, 615, 66 S. Ct. 402, 406, 90 L. ed. 350, 356.

[16] Screws v. United States, 325 U. S. 91, 107, 65 S. Ct. 1031, 1038, 89 L. ed. 1495, 1506.

[17] Bruton v. United States, 391 U. S. 123, 135, 88 S. Ct. 1620, 1627, 20 L. ed. (2d) 476, 484.

[18] Snyder v. Massachusetts, 291 U. S. 97, 122, 54 S. Ct. 330, 338, 78 L. ed. 674, 687.

a new trial. Whether substantial rights are affected requires an examination of the entire record and the probable effect of the defects or errors determined in the light of all of the evidence and proceedings viewed as a whole. In the final analysis, the application of the due-process requirement depends upon a consideration of the circumstances of the particular case. Except for a clear violation of constitutional rights basic to a fair trial, decisions in similar cases are of little value.[19]

Applying these standards and acknowledging that defendant's argument is not devoid of merit, we are nevertheless left with the conviction that the cumulative effect of the errors did not substantially influence defendant's conviction. Apart from defendant's illegal arrest, no single error was of constitutional dimension. Despite the state's intransigent position on some of the issues (provoked perhaps by our adversary system, the complexity of today's criminal proceedings, and the tactics of defense counsel), which resulted in errors that could have been avoided, neither defendant's illegal arrest nor errors with respect to deviations from statutory provisions for the selection of grand and petit jurors and the secrecy of grand jury proceedings, as well as other deficiencies claimed, have been demonstrated to be, in total effect, so contrary to fundamental principles of fairness as to require that the trial proceedings be repeated—especially when due regard is given to the trial court's vigilant efforts to protect defendant's constitutional rights at all stages of the proceedings.

Affirmed.

---

[19] Kotteakos v. United States, *supra.*