STATE of Minnesota, Respondent,

v.

**Mark Ward SOUTHARD, Appellant.**

STATE of Minnesota, Respondent,

v.

**Gary Nathanial STURDIVANT, Appellant.**

Nos. CX–84–726, C4–84–768.

Court of Appeals of Minnesota.

Jan. 8, 1985.

William R. Kennedy, Hennepin County Public Defender, Stephen D. Peterson, Asst. County Public Defender, Minneapolis, for appellant Southard.

Jerrold M. Hartke, Hartke & Monpetit, South St. Paul, for appellant Sturdivant.

Heard, considered and decided by NIER-ENGARTEN, P.J., and FOLEY and CRIPPEN, JJ.

## OPINION

FOLEY, Judge.

Defendants Gary Sturdivant and Mark Southard appeal their convictions for aggravated robbery, second degree assault, and first degree criminal sexual conduct. They also appeal the trial court's upward departure from the sentencing guidelines. We affirm.

## FACTS

In August 1983, a 20-year-old woman living alone with her three-month-old daughter was raped and robbed in her apartment. On the afternoon of the assault the victim made tentative arrangements to meet Michael Cooper, whom she had known for several years but had only recently begun dating. Since Cooper had no car she told him she would pick him up later.

The victim was still at home that evening when Gary Sturdivant, a former high school boyfriend, called and asked if he could visit. The victim heard Southard in the background. She told Sturdivant he could come, but not to bring Southard because she was afraid of him. She called Cooper and told him she could not pick him up because the baby was sleeping. When Sturdivant did not arrive by 10:30, the victim assumed he was not coming and went to bed.

After the victim's call, Cooper went out walking. He met Sturdivant and Mark Southard. They told him they were going out "pimping whores, putting prostitutes on the streets." Cooper asked to go along. They refused. So, "to feel a part of them,

Hubert Humphrey, III, State Atty. Gen., Thomas L. Johnson, Hennepin County Atty., J. Michael Richardson, Asst. County Atty., Minneapolis, for respondent.

to be a big shot," he lied and told them that he was going to pick up $700. When Sturdivant and Southard told him they were going to the victim's apartment, Cooper told them she was the one who had the money for him. They then agreed to let Cooper come with them. Sturdivant and Southard stopped so Cooper could pick up beer from a friend's house. They drove away while he was inside.

The victim was awakened after midnight by a knock at her door. She went to the door dressed in a bra and panties. Sturdivant and Southard forced their way into the apartment.

Southard pulled a folding knife on the victim and ordered her to remove her bra. She did so. Sturdivant slapped the victim and ripped a gold chain from her neck, breaking it. He asked her where she kept the rest of her jewelry.

Southard entered the victim's bedroom. She begged him not to turn on the light because it would wake her daughter. He responded by threatening to rape the baby and slash her throat. The victim later discovered that the bedroom had been ransacked and some of her jewelry was taken.

Southard brought a can of Impulse brand body spray from the bathroom to the living room. He handed the can to the victim and ordered her to "play with herself." Southard slapped her and put the knife to her throat. Sturdivant ordered her to remove her panties and she did so. Sturdivant and Southard each held one of her legs and spread them. Sturdivant inserted the can into her vagina and moved it in and out. They taunted the victim and ordered her to continue masturbating herself with the can. While she did so Sturdivant grabbed her breast. He marked her neck and chest with the knife and tried to cut her nipple.

Southard bent a coat hanger, and suggested to Sturdivant that they heat it and brand the victim so she could not run away. Southard dumped the contents of the victim's purse and searched for money. After defendants left, the victim discovered that the money, her address book, keys and food stamps were missing.

At knife point Sturdivant told the victim that she must work as a prostitute and produce $3,000 for him and $1,000 for Southard the next day. He told her he and Southard would bring the "tricks" to her apartment.

Southard saw a car pull up outside. It was Cooper. When Sturdivant and Southard left Cooper earlier that evening, he was concerned that they would harm the victim. Cooper called several people to find a ride to the victim's apartment. It took him about a half an hour to find a ride.

Cooper armed himself with a board as he approached the apartment. He knocked at the door, but defendants would not admit him. So Cooper walked to the kitchen window and looked in. He saw the victim sitting naked on the couch and saw that Southard had a knife. Cooper smashed the kitchen window with the board. Flying glass cut Southard's eye, causing it to bleed profusely. When Cooper realized he had injured Southard he got scared and left.

Sturdivant and Southard left shortly thereafter to take Southard for emergency medical treatment. As they left, they threatened the victim that they would be back. They told her they would kill her and her baby if she called the police.

Lawrence Schlichting, an upstairs neighbor, noted the arrival of a dark colored Buick, later identified as Sturdivant's. Schlichting called the police approximately a half an hour later when he heard Cooper break the kitchen window. While talking to the police on the telephone, he saw defendants leave in the Buick. He heard one threaten, "We'll be back." Schlichting estimated that the police arrived within one minute after Sturdivant's and Southard's departure.

The police found the victim naked and crying. Things were scattered about the living room and bedroom. There was a bent hanger on the couch and a can of Impulse brand body spray on an end table. Laboratory analysis revealed dried vaginal fluid on the can. The kitchen window was

broken and there was glass and blood on the kitchen floor. The officer noted that the victim's breast was bruised and that there were cuts on her neck.

Police arrested Sturdivant and Southard at Hennepin County Medical Center and seized their clothing. They found food stamps, money, the victim's address book, and her watch and missing necklaces in defendants' pockets. The victim's key ring and a folding knife were found in Sturdivant's car.

The defendants admit being at the victim's home and taking her keys, address book and watch. However, they contend that they did not assault the victim or tear apart her apartment. They say they visited the victim at her invitation. Sturdivant testified that he saw Cooper return to the apartment as they left.

The jury convicted both defendants of three counts of first degree criminal sexual conduct, two counts of second degree criminal sexual conduct, one count of second degree assault and one count of aggravated robbery. Because of the defendants' cruelty to the victim, the trial court ordered each of them to serve concurrent sentences of 86 months for one count of first degree criminal sexual conduct and 48 months for aggravated robbery. Both sentences are twice that prescribed by the sentencing guidelines.

### ISSUES

Defendants raise a number of common issues:

1. Did the trial court err in joining defendants for trial?

2. Did the trial court err in excluding character evidence about a state witness whom defendants contend committed the offenses for which they were convicted?

3. Did the trial court err in restricting inquiry into the facts underlying the victim's prior convictions and into her motives for cooperating with the prosecution?

4. Did prosecutorial misconduct prejudice the trial?

5. Did the court err in departing upward from the sentencing guidelines because of the particular cruelty of the offenses?

Southard raises one additional issue:

6. Did the trial court err in admitting evidence seized incident to Southard's arrest?

Sturdivant raises several other issues:

7. Did the trial court err in excluding impeachment evidence offered by the defense where the defense failed to lay proper foundation or to give the state adequate notice of the evidence?

8. Did the trial court err in imposing separate sentences for aggravated robbery and first degree criminal sexual conduct?

9. Was there sufficient evidence to sustain Sturdivant's conviction?

### ANALYSIS

### ISSUES RAISED BY BOTH DEFENDANTS

#### I.

Defendants challenge the trial court's joinder of trials over their objections. Minn.R.Crim.P. 17.03, subd. 2(1) provides:

When two or more defendants shall be jointly charged with a felony, they shall be tried separately provided, however, upon written motion the court in the interests of justice and not solely related to economy of time or expense may order a joint trial for any two or more said defendants.

State policy favors strongly separate trials. *State v. Swenson*, 301 Minn. 199, 201, 221 N.W.2d 706, 708 (1974). Ordinarily a joint trial may not be ordered to spare the victim the trauma of testifying in multiple trials. *State v. Googins*, 255 N.W.2d 805 (Minn.1977) (defendant convicted of terroristic threats, indecent exposure, and disorderly conduct). However, the Minnesota Supreme Court has approved joint trials in cases where the crime was particularly terrifying, and/or where the

victims were particularly frail or vulnerable. *State v. Gengler*, 294 Minn. 503, 504, 200 N.W.2d 187, 189 (1972) (multiple defendants charged with having sexual intercourse with and sodomizing 14 year old); *Swenson*, 301 Minn. at 202, 221 N.W.2d at 708 (aggravated robbery victims aged and in poor health).

This case is not unlike *Gengler*, 294 Minn. at 504, 200 N.W.2d at 189, where the supreme court held, "Clearly, it was in the interests of justice that the victims be spared the ordeal of testifying on three separate occasions to the terrifying and revolting details of these offenses." In addition, because the defendants acted in such close concert, a joint trial was permissible to facilitate the jury's comprehension and appreciation of each defendant's role in the assault. *See State v. Strimling*, 265 N.W.2d 423, 432 (Minn.1977).

Furthermore, defendants did not suffer any substantial prejudice from joinder. There were no inconsistent defenses raised, and neither defendant required exculpatory evidence of the other. Southard and Sturdivant routinely adopted each other's motions and arguments. *See Strimling*, 265 N.W.2d at 432; *Swensen*, 301 Minn. at 202, 221 N.W.2d at 708. Although joint trials should be the exception rather than the rule, we hold that the trial court did not abuse its discretion in ordering a joint trial in this case.

## II.

■ Defendants challenge the trial court's restriction of evidence of Cooper's character. The court admitted Cooper's convictions, testimony by the victim that she previously had a knife fight with Cooper, and testimony by an acquaintance of Cooper's that he was a liar and a thief. The court refused to admit confidential group counseling reports or evidence of the facts underlying Cooper's convictions. Defendants contend that the court should have admitted such evidence because Cooper rather than they assaulted the victim.

The Minnesota Supreme Court has shown a willingness to permit admission of collateral matters where the defense contends that the crime was committed by a witness for the state. *State v. Hawkins*, 260 N.W.2d 150 (Minn.1977); *State v. Phelps*, 328 N.W.2d 136 (Minn.1982). In *Hawkins*, the defendant contended that Czuchry, a state witness, actually committed the murder. The trial court refused to admit evidence that Czuchry suffered black outs when he drank and that he had prior illegal dealings with the victim. The supreme court reversed and remanded for new trial, holding that Hawkins' defense theory put Czuchry's character at issue.

[W]here the issue is whether in fact the defendant killed the deceased, evidence tending to prove that another person did the killing is admissible. The purpose of evidence to show that another committed the homicide is not to prove the guilt of the other person, but to generate a reasonable doubt of the guilt of the defendant. * * * Proper foundation must be laid for the admission of such evidence, however, to avoid the consideration of matters collateral to the crime. * * * [E]vidence tending to incriminate another is inadmissible in the absence of proof of facts to connect that person with the crime. * * *

Once the necessary foundation is proven, it is permissible to introduce evidence of a motive of the third person to commit the crime, threats by the third person, or other miscellaneous facts which would tend to prove the third person committed the act.

*Hawkins*, 260 N.W.2d at 158–59 (footnotes and citations omitted).

In *Hawkins*, the supreme court found that Czuchry's testimony that he was present when the defendant committed the crime was sufficient foundation to connect him to the crime. Here neither defendant claims to have seen Cooper assault the victim. The victim identified defendants as her assailants. The only evidence suggesting that Cooper could have committed the offenses was Sturdivant's testimony that he saw Cooper head back toward the apartment when the defendants left.

A disinterested neighbor testified that police arrived no more than one minute after the defendants left. It would have been physically impossible for Cooper to break into the victim's apartment; strip, cut, bruise and rape her; ransack the place; and escape in that period of time. Cooper may have had a motive to injure her, but the neighbor's testimony establishes that he did not have the opportunity. In such circumstances the trial court did not err in refusing to admit the character evidence against Cooper.

### III.

■ Defendants also contend that the trial court erred in restricting impeachment evidence against the victim. The trial court refused to admit testimony by four police investigators concerning the facts underlying the victim's convictions and their opinion of her truthfulness. It also refused to permit inquiry into whether prosecutor's office made a deal with her to delay execution of out-of-state warrants against her in exchange for her testimony against defendants.

The trial court did not err in excluding testimony by the investigators. The jury was informed that the victim had worked as a prostitute and had two forgery convictions. Over prosecution objections, the trial court permitted the defense to question her at length about the factual basis for one of the convictions. In addition, the court admitted evidence that Cooper described the victim as a "bull-shitter" and that a high school friend of hers considered her a liar. It would have unnecessarily complicated the trial and confused the issues, without any significant benefit to the truth-seeking process, to have admitted more details of the offenses. *See State v. Patterson,* 329 N.W.2d 840, 841 (Minn. 1983).

The trial court's limitation of inquiries into the victim's motives for cooperating with the prosecution was likewise appropriate. The defense's undisguised strategy throughout trial was to try the victim. This court rejected a similar attempt in *State v. Taylor,* 353 N.W.2d 656 (Minn.Ct. App.1984). There the court held:

> The defense alleges the trial court erred in not allowing evidence of her pending forgery charges, claiming that "Ms. Crossland was shading her testimony to please the state." It is difficult to follow this logic. Crossland was not a co-defendant of appellant, hoping for a reduced charge or sentence if she testified against him. She was the victim of a rape by defendant. There was no error in disallowing this evidence.

*Id.* at 658.

### IV.

■ Defendants allege that they were prejudiced by the prosecutor's efforts to bring misdeeds by Sturdivant and his wife to the jury's attention. They also object to the prosecutor's comment in closing arguments about the defense's failure to call certain witnesses.

The victim testified that several years ago Sturdivant tied her up and took nude photos of her. She said that for one week she stole $700 per day from her father and gave it to Sturdivant. Sturdivant took the photos when she quit paying him.

Sturdivant's counsel did not object immediately. He waited until later when the attorneys met in chambers with the judge to raise the matter. Then he asked for a mistrial, or "at the very least" permission to introduce a nude photograph of the victim published in a newspaper in 1981. The photo was ostensibly offered to impeach the victim's veracity by showing she used an assumed name. Despite defense counsels' failure to make a timely objection, the trial court ordered the allegation of misconduct by Sturdivant stricken and instructed the jury to disregard it.

The prosecutor also asked Sturdivant if he knew whether his wife was a prostitute. The trial court ordered the question stricken and instructed the jury to disregard it. Subsequently, upon a motion by both defense counsel, the trial court permitted Sturdivant's attorney to give Sturdivant an opportunity to deny the allegations of mis-

conduct against himself and his wife. No further mention was made of either matter.

The prosecutor should not have elicited evidence of an uncharged offense by Sturdivant without giving the defense appropriate *Spreigl* notice. Minn.R.Crim.P. 7.02; *State v. Spreigl*, 272 Minn. 488, 139 N.W.2d 167 (1965); *State v. Billstrom*, 276 Minn. 174, 149 N.W.2d 281 (1967). Nor should he have sought to introduce Sturdivant's wife's prostitution record. However, in light of the timing of defense objections, the opportunity that the court gave Sturdivant to deny the allegations, and the court's curative instructions, we find that the references to alleged misconduct by Sturdivant and his wife were not prejudicial.

█ The prosecutor's comment in closing arguments, "Well, we could have done like the defense and not brought those people in." was likewise harmless error. Commenting on a defendant's failure to call witnesses is clear prosecutorial misconduct because it suggests to a jury that the defendant had some duty to produce witnesses or that he did not call the witnesses because he knew their testimony would be unfavorable. *State v. Caron*, 300 Minn. 123, 127, 218 N.W.2d 197, 200 (1974). The trial court mitigated the error by permitting Sturdivant's attorney to explain to the jury that the defense had not called Sturdivant's mother because she could not handle the pressure of testifying.

█ A defendant is entitled to a fair trial, but not a perfect one. Because of human involvement no criminal proceeding is likely to be completely free of defects, irregularities or errors. Only those of such character as prejudice substantial rights justify granting a new trial. *State v. Mastrian*, 285 Minn. 51, 75, 171 N.W.2d 695, 710 (1969).

The prosecutor made errors in this case. However, we find that they could not have played a substantial role in influencing the jury to convict. *Caron*, 300 Minn. at 128, 218 N.W.2d at 200. The evidence against the defendants was exceptionally strong.

The victim unequivocally identified them as her assailants. Her story was corroborated by the condition of her apartment when the police arrived, the bent hanger, the presence of vaginal fluid on the Impulse can, and the injuries she suffered. In addition, her keys and a knife matching the description of the one with which she was threatened were found in Sturdivant's car. Food stamps, the victim's watch, jewelry taken from her bedroom, and her address book were found upon the defendants. Defendants admit being at her apartment and taking the keys, address book and watch.

V.

█ Finally, defendants allege that the trial court erred in doubling the presumptive sentences for their offenses. The court departed upward because of the defendants' particular cruelty to the victim. We find that the departure was within the trial court's discretion. The record establishes that the attack upon the victim was vicious, brutal and dehumanizing. Defendants sexually assaulted her in her own home. *See State v. Morales*, 324 N.W.2d 374 (Minn.1982). They forced an aersol can into her vagina. *State v. Johnson*, 327 N.W.2d 580, 584 (Minn.1982) (threats to kill victim and painful injurious penetration with a stick justified increase from 132 months to statutory maximum of 20 years). They terrorized the victim with threats to brand and kill her, and to rape and kill her child. *See Davis v. State*, 324 N.W.2d 802 (Minn.1982); *State v. Martinez*, 319 N.W.2d 699 (Minn.1982); *State v. Pickett*, 343 N.W.2d 670 (Minn.Ct.App.1984). They degraded her verbally and forced her to masturbate herself with the can while they watched. *Cf. State v. Deschampe*, 332 N.W.2d 18 (Minn.1983).

Defendants suggest that the fact that the victim was a former prostitute in some way mitigates the seriousness of their offense. We emphatically reject such a proposition. A prostitute is entitled to be free from attack the same as any other person. Whatever the lifestyle of the victim here,

she has her rights, and in this case, those rights were cruelly violated.

## ISSUE RAISED ONLY BY SOUTHARD

### VI.

■ Southard alleges that the trial court erred in admitting evidence taken from him at the hospital emergency room. The trial court found that the search and seizure was incident to arrest. That determination is supported by the testimony of the arresting officers. Therefore, the evidence was properly admitted.

## ISSUES RAISED ONLY BY STURDIVANT

### VII.

■ Sturdivant alleges that the trial court erred in excluding testimony by his mother concerning inconsistent statements Cooper allegedly made to the mother. The testimony was offered to impeach the veracity of Cooper. The trial court properly excluded the mother's testimony because Cooper was never questioned at trial about the alleged statements. Exclusion was also justified pursuant to Minn.R.Crim.P. 9.03 because the defense failed to disclose the mother's statement to the prosecutor until the morning she was to be called at trial.

### VIII.

■ Sturdivant also challenges the trial court's imposition of two sentences, one for first degree criminal sexual conduct and one for aggravated robbery. Minn.Stat. § 609.035 (Supp.1983) prohibits a sentencing court from imposing multiple sentences for a single behavioral incident.

> In deciding whether two or more intentional crimes were part of the same course of conduct, one must focus on the factors of time and place and also consider whether the segments of conduct involved were motivated by an effort to obtain a single criminal objective.

*State v. Banks*, 331 N.W.2d 491, 493 (Minn. 1983). In this case, as in *State v. Powless*, 272 N.W.2d 258, 259 (Minn.1978), the underlying conduct was divisible and was motivated by a desire on defendant's part to obtain two different criminal objectives. Therefore it was appropriate for the trial court to impose separate sentences for the offenses.

### IX.

■ Finally, Sturdivant's contention that the evidence was insufficient to sustain his conviction on all counts is meritless. In reviewing a claim of insufficiency of evidence, an appellate court must view the evidence in the light most favorable to the state and assume the jury believed the state's witnesses and disbelieved any contradictory evidence. *State v. Parker*, 353 N.W.2d 122, 127 (Minn.1984). In light of the strong evidence, we are compelled to affirm.

## DECISION

We affirm the convictions and sentences of defendants Sturdivant and Southard.