STATE of Minnesota, Respondent,

v.

Curtis OWENS, Appellant.

No. C6–83–1202.

Supreme Court of Minnesota.

Aug. 23, 1985.

C. Paul Jones, Minnesota State Public Defender, Mark F. Anderson, Asst. State Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Minnesota Atty. Gen., St. Paul, Thomas L. Johnson, Hennepin County Atty., Vernon E. Bergstrom, Chief App. Section, Richard Osborne, Asst. County Atty., J. Michael Richardson, Beverly J. Wolfe, Paul R. Jennings, Asst. County Attys., Minneapolis, for respondent.

COYNE, Justice.

Defendant was found guilty by a district court jury of first-degree premeditated murder and was sentenced by the trial court to life imprisonment. Minn.Stat. § 609.185(1) (1982). On this appeal from judgment of conviction and from an order denying postconviction relief, defendant seeks (1) an outright reversal of his conviction because the evidence of his guilt was legally insufficient or (2) a new trial because (a) the trial court improperly limited defendant's questioning of prospective jurors at voir dire and denied defendant's peremptory challenge of a juror, (b) the trial court erred in allowing the prosecutor to use a prior conviction to impeach defendant's credibility as a witness, and (c) the trial court erred in refusing to grant defendant a new trial on the basis of newly-discovered evidence. We affirm.

The prosecution arose from the fatal shooting of 24-year-old Melvin Thomas as he sat in his car in the parking lot for an apartment building at 1516 Plymouth Avenue North in Minneapolis at 8:20 p.m. on September 30, 1982. A key witness at defendant's trial was Randolph Pratt, who was acquainted with both Thomas and defendant and who lived in the apartment building served by the lot. When police first arrived on the scene of the shooting they questioned Pratt, among others. Pratt said that he had just come out of the building when he heard the shots and that when he rounded the corner of the building, he saw two men running down the alley. The officer who talked with Pratt testified that he appeared very nervous and that he followed his description of the events with the statement, "My wife and children have to live in this area. I don't want nothing put on me."

Pratt stuck to his initial version of the events until October 4, when police brought him to the station for questioning. Police Sergeant Bernard Bottema told Pratt that another tenant of the building, Ida Little, had told them that seconds before hearing the fatal shots she heard someone say, "Slim, don't do it." "Slim" is defendant's nickname. Sergeant Bottema asked Pratt if he was a religious man and if he believed that killing was wrong. When Pratt answered yes to both questions, Sergeant Bottema told Pratt that it would be wrong if he had seen something but did not tell them about it. Pratt said he was afraid of the murderer and had to live in the neighborhood. After Bottema told Pratt that he would be protected if he told the truth, Pratt changed his story.

As Pratt recounted it to Sergeant Bottema and in his testimony at trial, Thomas knocked at his balcony moments before the shooting. Pratt grabbed his hat, went out the side door of the apartment building, and headed toward the parking lot. As he approached the parking lot he saw Thomas sitting in his car, with the motor running and the door open on the driver's side. He saw defendant run toward Thomas' car and saw defendant's hand in his right pocket. Pratt yelled, "Slim, Slim, please don't do it," and then saw defendant fire one to three shots at Thomas. After shooting Thomas, defendant ran down the alley with another man who had been standing back in the alley.

The only other evidence placing defendant at the scene of the shooting was the corroborating testimony of Ida Little that she heard someone shout, "Slim, don't do it." The state was able, however, to produce strong additional evidence of opportunity and motive. Defendant lived just 2½ blocks from the scene of the shooting and therefore had the opportunity. His motive stemmed from a violent dispute he had had with Thomas two days earlier. On September 28 defendant had accused Thomas of stealing a video cassette containing cartoons and selling it. During the incident defendant attacked Thomas with an ax, inflicted cuts on Thomas' face requiring stitches, and threatened to kill Thomas later. On September 29, the day after the ax incident and the day before the shooting, defendant and some acquaintances were

standing outside when someone fired buckshot at them. Defendant was shot in his upper right thigh and a companion's chest was creased by two pellets. Although the identity of the gunman was never conclusively established, there was evidence not only that it was Thomas (after the killing police found hidden in Thomas' car a sawed-off shotgun loaded with shots the same size as those found at the scene of the shooting of defendant on the 29th) but, more importantly, that defendant thought it was Thomas (defendant told police that the "talk on the street" was that it was Thomas; defendant testified, however, that he had not heard the "street talk" until after the murder).

The defense was based primarily on the testimony of defendant and other witnesses that defendant was outside his house talking with a friend, Bennet Whitfield, when the shooting occurred. Doubt was cast on defendant's testimony by evidence that when he first talked with the police about the shooting of Thomas he did not furnish the names of any alibi witnesses and said that he had been home all night with his children. Ms. Whitfield and another witness corroborated defendant's alibi testimony, but the prosecutor impeached their testimony with evidence that, although they were friends of defendant, they did not come forward with the information even after they learned of defendant's arrest.

■ 1. Defendant's first contention is that the state failed to prove beyond a reasonable doubt that he killed Thomas. This contention is without merit. The jury was aware that the state's key witness, Pratt, made prior inconsistent statements when police first talked with him. Inasmuch as there was a plausible explanation for the prior inconsistent statements and since Pratt's testimony was corroborated by that of Little and the other evidence of motive and opportunity, we believe that the jury was justified in crediting Pratt's testimony and finding defendant guilty as charged.

2. Defendant alternatively seeks a new trial on one or more of a number of grounds.

■ (a) First, defendant argues that he was denied his right to an impartial jury because the trial court refused to allow him to ask prospective jurors these two questions:

Do you think it is possible for anyone in our society to be arrested and charged for a crime for which he is innocent?

Have you ever been blamed in your life for something you did not do?

The voir dire examination of jurors is governed by Minn.R.Crim.P. 26.02, subd. 4(1):

A voir dire examination shall be conducted for the purpose of discovering bases for challenge for cause and for the purpose of gaining knowledge to enable an informed exercise of peremptory challenges, and shall be open to the public.

The rule goes on to provide that the judge shall initiate the voir dire examination and put to the prospective jurors any questions the judge considers necessary, and that the judge may give preliminary instructions. Under the rule either party may make reasonable inquiry of a prospective juror before exercising a challenge. *Id.* It is the trial court's responsibility to prevent abuse of the examination process and it is within the trial court's discretion to deny permission to ask certain questions. The trial court had included in his preliminary instructions to the jury panel the presumption of innocence, burden of proof, and other pertinent legal principles. Hence, we do not address the issue of the appropriateness of the questions disallowed here. It is sufficient to say that the record on appeal does not compel the conclusion that the trial court's limitation on voir dire examination prevented defendant from "discovering bases for challenge for cause" or "gaining knowledge to enable an informed exercise of peremptory challenges." Under these circumstances, we conclude that the trial court did not abuse his discretion.

■ (b) Defendant next argues that the trial court erred in denying defendant's peremptory challenge of a particular juror.

Voir dire examination of prospective jurors in this case was done pursuant to the method outlined in Minn.R.Crim.P. 26.02, subd. 4(3)(c), which provides:

1. The court shall direct that one prospective juror at a time be drawn from the jury panel for examination.

2. The prospective juror so drawn shall be sworn to answer truthfully questions asked him relative to his qualifications to serve as a juror in the case.

3. The prospective juror shall be examined by the court and then by the parties, commencing with the defendant.

4. Upon completion of defendant's examination, the defendant may challenge the juror for cause or peremptorily as permitted by these rules.

5. If the juror is excused, another prospective juror shall be drawn from the panel and shall be examined and subject to challenge in the same manner.

6. If a prospective juror is not excused after examination by the defendant, he may be examined by the state and may be challenged for cause or peremptorily by the state.

7. This process of selection shall continue until the number of persons of which the jury shall be composed for trial of the case is selected and sworn as the trial jury plus the number of any alternate jurors.

. . . .

This method is the method "preferred" by the rules in cases of first-degree murder "unless otherwise ordered by the court." Minn.R.Crim.P. 26.02, subd. 4(3)(c)8.

During his questioning of one of the prospective jurors defense counsel asked whether she had ever been the victim of a crime and she said no. Defense counsel did not challenge her for cause or use any of his peremptory challenges. Then when the prosecutor questioned her about crime in her neighborhood, she related that once someone who was high on drugs had attempted to break into her house. After completing his questioning, the prosecutor also accepted the woman as a juror. Defense counsel did not seek permission to ask any followup questions and did not challenge the juror either for cause or peremptorily at that point. A short time later, after the juror was sworn, defense counsel moved the court to allow him to challenge her for cause. The court denied the challenge. Defense counsel then sought to exercise a peremptory challenge to strike her. The trial court refused, stating that defense counsel's challenge was untimely because the juror already had been sworn. Defendant does not object to the trial court's denial of his challenge for cause, but he argues that the trial court erred in refusing to allow a peremptory strike.

In *State v. Kitto*, 373 N.W.2d 307 (Minn. 1985) (filed herewith), we hold that under Minn.R.Crim.P. 26.02, subd. 5(2),[1] the trial court has discretion to permit a defendant to exercise a peremptory challenge any time after his right to make such a challenge has expired up until the impaneling of the jury. In this case, the trial court apparently believed that it had no discretion. Since the rule makes express reference to the trial court's discretion only with respect to a challenge for cause, there was some justification for the trial court's belief. In any event, we do not believe that the court was obligated to allow the challenge in this case. While the court could have allowed the challenge, it did not clearly abuse its discretion in refusing to do so.

■ (c) Defendant next argues that the trial court erred in denying defendant's motion in limine to prohibit the prosecutor from using his 1981 conviction for possession of cocaine to impeach him when he

---

1. Minn.R.Crim.P. 26.02, subd. 5(2) provides:

A challenge for cause may be oral and shall state the grounds on which it is based. The challenge shall be made before the juror is sworn to try the case, but the court may for good cause shown permit it to be made after he is sworn but before all the jurors constituting the jury are sworn.

. . . .

testified. The conviction by itself "arguably had very little relevance to * * * defendant's credibility as a witness," *State v. Taylor,* 264 N.W.2d 157, 157 (Minn.1978), but, in view of evidence elicited by the defense concerning Pratt's involvement in drugs, the trial court concluded that it would not be fair to prohibit the state from at least impeaching defendant's credibility on the same basis. We hold that the trial court did not err in denying the motion.

■ (d) Defendant's final argument is that the trial court and the postconviction court erred in refusing to grant defendant a new trial on the basis of newly-discovered evidence.

As we stated recently in *State v. Swanson,* 353 N.W.2d 128, 130 (Minn.1984), "Generally, in order to obtain a new trial on the ground of newly-discovered evidence, the defendant has to establish that the evidence was not known to him at the time of trial, that his failure to learn of it was not due to lack of diligence, that the evidence is material, and that it will probably produce an acquittal at a retrial."

At the post-trial hearing on his motion for a new trial, defendant called an investigator, who testified that he had learned that one Larone Toy had approached defendant's fiancee, Grace Webster, and told her, and later him, that on the evening of September 30 he had seen two men drag or help Melvin Thomas out of the apartment building in which Pratt lived. The investigator testified further that he had not been able to locate Toy to subpoena him for the hearing.

At the postconviction hearing defendant called two new witnesses. One, Marie Fedick, a friend of Grace Webster, testified that at 7:30 p.m. on the night in question she saw two men carry a body out of the apartment building, that a third man came out moments later, that shots were fired, and that two of the men ran away and the third reentered the apartment building. She testified that she never reported what she had seen to the police and did not tell Grace Webster about it until a year later.

The other witness at the postconviction hearing was Robert Braziel, a neighbor of defendant and acquaintance of Webster, who testified that after he saw defendant talking with Whitfield, he walked toward the Elk's Club, which is near Pratt's apartment building, heard shots, saw two men run away from the building, and saw Pratt enter the building. Braziel admitted that he never reported what he had seen to the police and he admitted that it was not until 1½ years after the incident that he claimed Pratt was involved.

We hold that the trial court did not err in denying either the motion for a new trial or the petition for postconviction relief. The evidence was of such doubtful credibility that it cannot be said that any of it "will probably produce an acquittal at a retrial." In short, defendant did not meet his burden of proof on the issue.

In summary, we are satisfied that defendant received a fair trial, that the evidence of his guilt was sufficient to support his conviction, and that the evidence produced at the post-trial hearings did not constitute newly-discovered evidence entitling defendant to a new trial.

Affirmed.