**STATE of Minnesota, Respondent,**

v.

**Dennis J. KING, Appellant.**

No. C6–87–656.

Court of Appeals of Minnesota.

Oct. 27, 1987.

Review Denied Jan. 15, 1988.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Thomas L. Johnson, Hennepin County Atty., Vernon E. Bergstrom, Chief, Appellate Section, Beverly J. Wolfe, Asst. Co. Atty., Minneapolis, for respondent.

C. Paul Jones, State Public Defender, Mark F. Anderson, Asst. State Public Defender, Minneapolis, for appellant.

Dennis J. King, pro se.

Considered and decided by SEDGWICK, P.J., and PARKER and HUSPENI, JJ., with oral argument waived.

## OPINION

SEDGWICK, Judge.

Dennis J. King appeals his conviction for second and third degree assault, alleging he is entitled to a new trial on several grounds, including the discovery of new evidence. We remand for an evidentiary hearing so the trial court may assess the credibility of the new evidence, and for a redetermination by the trial court of King's motion for a new trial based on this evidence.

## FACTS

On the night of May 30, 1986, King and his sometime girlfriend Pearl Blanchard went to a party together. Early the next morning, King took Blanchard to a hospital for treatment of injuries from a severe beating. Blanchard first told police she had been beaten by strangers who had picked her up while she was hitchhikihg, but several months later told police her attacker was King.

King and Blanchard had known each other and had lived together at several addresses since approximately September 1985. In February 1986, Blanchard's three children (none by King) were taken from her and placed in foster homes. Blanchard testified she lost her children "because of King."

In the spring of 1986, King testified, he began to "drift off" from Blanchard because of their excessive drinking and involvement with other people. King then moved in with his uncle, Archie King, in St. Paul. Blanchard would occasionally visit King and stay at Archie's.

According to Archie, on May 30, 1986, he lent King his van to collect signatures on a petition related to Archie's candidacy for Chippewa tribal chairman. Blanchard testified she had been staying with King the past few days, and she was helping with the petition drive. Archie testified King and Blanchard left with the van that night, returned about 10:30 p.m., and then left again. They drove the van to a party in south Minneapolis, arriving around 11 p.m.

At 10:40 a.m. the next morning, King brought Blanchard in the van to the emergency room of St. John's hospital in St. Paul. Her blood alcohol content was .114.

Blanchard had been badly beaten. A doctor testified she was in pain; she had cuts on her face, back and hands, apparently inflicted by a knife or glass; she had abrasions and bruises all over her body; and she had a fractured rib and a bruised kidney. Her bruises were consistent with injuries caused by a blunt, hard object, such as a hammer, and her injuries could have been inflicted from 6 to 18 hours before the examination.

Police officer William Miske interviewed Blanchard in the hospital about 11 a.m. that day. Miske testified she was "quite incoherent the majority of the time * * *, fading into unconsciousness and then coming back." Blanchard told him she had been drinking in a bar the night before, and

when it closed she hitchhiked a ride with two white men with blonde hair. The men drove her to Minnehaha Park, beat her for a long time, called her an "Indian bitch" and threatened to kill her. They dropped her off by a gas station. She called her boyfriend, and he picked her up and drove her to St. John's.

Miske asked Blanchard if her boyfriend had beaten her, and she said no. Blanchard gave Miske the wrong telephone number for her boyfriend; the number she gave was the same as Archie's except for the last digit.

On September 4, 1986, Blanchard told the police her attacker was King and she gave them a written statement which formed the basis for a complaint charging King with two counts of assault in the second degree, Minn.Stat. 609.222 (1986) (assault with a dangerous weapon); count I was for assault with a hammer, and count II was for assault with a knife. The complaint also charges King with a third count of assault in the third degree, Minn.Stat. § 609.223 (1986) (inflicting "substantial bodily harm.")

The complaint indicates that Blanchard was claiming King assaulted her after they left the party together:

Ms. Blanchard states that King started to become jealous of other males that were at the party. He then asked Ms. Blanchard to go for a ride with him in his van.

The complaint states that King drove to Minnehaha Park and assaulted Blanchard in the van.

The trial began Friday, January 30, 1987. The state's opening statement indicated Blanchard would testify King assaulted her after they left the party together.

On Monday, February 2, before testimony began, the state told the court and the defense that Blanchard's version of the events leading up to her assault had changed:

I spoke on Saturday, January 31st with Pearl Blanchard, the victim, and I explained to her that the defense * * * in part was going to be that she and Dennis King had left the party separately and

she said indeed that that was true and * * * as she recalls it it was early morning when she left and that she went to the house of a friend of hers named George and that she was kissing George in George's house when Dennis King came in through the window and apparently surprised them and that she fled upstairs in the house; that Dennis King followed her upstairs and grabbed her, dragged her down the stairs, out to the van where he then took her out to Minnehaha Falls and * * * did all that stuff that she's already described * * *.

King's counsel moved to disqualify Blanchard as a witness, and for a continuance because

I cannot run out and find somebody by the name of George where I don't have any idea where that person is to corroborate this testimony.

The court denied both motions:

Well, if the complaining witness changes her story at different times that's her prerogative * * *. You have certainly got a right to cross-examination her on all those points.

Number two, there apparently is a new witness [the prosecutor] has brought to our attention this morning, but tells the Court he doesn't intend to call that witness.

And so I do not see any reason that we cannot proceed and the motions for dismissal and a continuance are denied.

Blanchard testified she went to the party with King, but she left alone at about 1 or 1:30 A.M. While walking to her sister's house, she ran into a friend named George Door [phonetic], and they went back to his house, which was about four blocks from the party. About an hour later, King came in through the window. Blanchard and Door were then sitting and talking, but previously had been kissing.

Blanchard ran upstairs and hid, but King found her and dragged her down the stairs and out of the house, and threw her in the van. King drove to Minnehaha Falls. He beat her with his fists and a hammer, kicked her, and cut her with a knife, stat-

ing, "I'll make sure that nobody ever, you don't ever mess around with nobody else." Blanchard would occasionally lose consciousness, and when she came to, King would resume beating her. This lasted about five hours, until daylight.

Blanchard also testified that in the morning, King drove to Archie's house and changed out of his bloody clothes. King came back to the van with Archie. King told Archie he didn't know what he was going to do with her. They drove her to the hospital. King carried her inside, put her in a wheelchair provided by a nurse, and left.

Blanchard testified she initially told police and doctors the hitchhiker story because King had threatened to "go after" her 11–year old son if she told the truth. She later decided to turn King in after being urged to do so by a battered woman's program and her mother.

King testified that Blanchard became jealous when he talked to another woman. He refused to leave with her, and Blanchard left alone between 2 and 4 a.m. King stayed at the party, talking to his friend John Czeck and two others.

The four of them drove to Czeck's mother's house when it became light out, at about 5:30 or 6 a.m. King stayed for at least an hour, and then left in the van to return to Minneapolis. He claims he found Blanchard near Archie's.

I got off 94 * * * and I seen this girl walking there * * * and it looked like Pearl * * *. I stopped * * * and I jumped out and I * * * went running over there and I grabbed her and I said, "What happened, what happened," and she wasn't really saying too much, you know, it was kind of mumbled * * *, so I grabbed her and I started pulling her over to the van, I opened the van and I put her in there and I slammed the van and I ran around and I was just getting in the van and I heard my uncle Archie calling.

So then he come over there and I ran over there to him and I said, "Come on, we got to get Pearl to the hospital because she's all beat up," and * * * then

we stopped over at his house and we got a blanket and * * * then we went to the hospital.

Archie testified that on the morning of May 31, he saw the van parked on the next block over from his house (at the same corner King testified he found Blanchard). King was walking near the van. Archie walked over and saw Pearl was sitting on the floor in the back of the van. Before driving to the hospital, Archie told King, "[I]f you are involved in any way in this * * *. I don't need this again."

Archie estimated that no more than 20 minutes passed between his first seeing Blanchard and arriving at the hospital; he thought they arrived about 8:40. He further testified King's clothes were not bloody, King did not go in his house, and he never found bloody clothes in his house.

Czeck testified he saw Blanchard leave the party alone at about 3 or 4 a.m. At daybreak, he, King, and two others drove to his mother's house. King was there until about 7 or 8 a.m.

Czeck's mother testified she was awakened by people talking on her porch at about 2:30 a.m. She went out to see who it was, saw Czeck and King, and returned to bed. Later, when there was daylight, she was awakened by the sound of a car leaving. She didn't see the car, but assumed it was King's.

Another witness testified that in late October or early November, 1986, he was drinking with Blanchard at her house, and he asked her,

[D]o you still go with Dennis? And she replied to me * * *, "That fucker's with some younger bitch." * * *

After some time * * * she said, "Yeah, that fucker's going to go to prison for a while, I'm going to testify against him for something." * * *

* * * I said, "Well, what did he do?" And she goes, "That doesn't matter," she said, "He's going to go to prison." * * * I asked, "Well, did he do it again," and she said, "No, but I want that fucker to think," or something about not * * * fucking her around cause she kept on

bringing his girlfriend's name up * * *, the younger girl that he was going out with.

Blanchard denied the conversation took place.

Finally, an investigator for the public defender's office, Russ Krueger, testified that he had identified an individual named George Door. Krueger was reasonably certain this was the person Blanchard referred to, but Door could not be subpoenaed because he had moved three days ago without leaving a forwarding address.

The trial ended February 3. The jury found King not guilty of count I, but guilty of counts II and III. It is unclear how long they deliberated, but they requested a St. Paul map at 5:20 p.m. (the request was denied), and they returned their verdict at 9:40 p.m. The trial court denied King's oral motion for a new trial.

After trial, Krueger located a person named George Dorr [sic]. Dorr gave King's attorney an affidavit which stated that he was personally acquainted with both Blanchard and King and that neither was with him or at his house on May 30 or 31st.

At his sentencing hearing, King moved for a new trial based on the Dorr affidavit. The motion was denied. King was sentenced to concurrent prison terms of 44 months for second degree assault and 36 months for third degree assault.

## ISSUES

1. Is appellant entitled to a new trial based on the trial court's denying him a continuance?

2. Is appellant entitled to a new trial based on newly-discovered evidence?

3. Is appellant entitled to vacation of his conviction and sentence for third degree assault under Minn.Stat. §§ 609.035, –.04 (1986)?

4. Is appellant entitled to a new trial because the trial court permitted the victim to testify and failed to instruct the jury to disregard the victim's testimony, or because the verdict is unsupported by the evidence?

## ANALYSIS

### I.

King contends the trial court's refusal to grant a continuance to allow him to locate Dorr was an abuse of discretion and denied him due process.

### A. *Constitutional standard.*

An accused in a criminal case has a constitutional right "to have compulsory process for obtaining witnesses in his favor." U.S. Const. amend. VI; *Washington v. State of Texas*, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967) (applying this right to state trials). The right to call witnesses in one's behalf is an essential element of a fair trial and due process. *Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S.Ct. 1038, 1045, 35 L.Ed.2d 297 (1973).

In determining whether King's constitutional rights have been violated, we must consider whether he sufficiently showed, when he moved for the continuance, that the missing witness would be found within a reasonable time and would provide favorable, noncumulative evidence. *See United States v. Little*, 567 F.2d 346, 348–49 (8th Cir.1977), *cert. denied*, 435 U.S. 969, 98 S.Ct. 1608, 56 L.Ed.2d 60 (1978) (trial court properly denied continuance where no showing witness would be available or what his testimony would be); *see also Dickerson v. State of Alabama*, 667 F.2d 1364, 1370 (11th Cir.), *cert. denied*, 459 U.S. 878, 103 S.Ct. 173, 74 L.Ed.2d 142 (1982); *Hicks v. Wainwright*, 633 F.2d 1146, 1149 (5th Cir.1981); *Singleton v. Lefkowitz*, 583 F.2d 618 (2d Cir.1978), *cert. denied*, 440 U.S. 929, 99 S.Ct. 1266, 59 L.Ed.2d 486 (1979).

Here, at the time of his motion, King did not show he would be able to produce the witness within a reasonable time, or that the testimony would be favorable. The trial court's denial of the continuance was therefore constitutional.

King cites the Eighth Circuit's five-part test as the standard for evaluating the denial of a continuance. *See United States*

*v. Kopelciw,* 815 F.2d 1235, 1238–39 (8th Cir.1987). That test does not explicitly refer to the availability of the witness or the nature of the testimony. In *Little,* however, the Eighth Circuit relied on those two factors while applying the five-part test. Even if that test is considered the exclusive constitutional standard in this circuit, therefore, our analysis is consistent with it.

### B. *Common law standard.*

■ The following standard of review has consistently been applied under Minnesota common law:

> The decision to grant or deny a motion for a continuance lies within the sound discretion of the trial court and will only be reversed upon a showing of abuse of discretion. * * * The reviewing court must examine the circumstances before the trial court at the time the motion was made to determine whether the trial court's decision prejudiced defendant by materially affecting the outcome of the trial.

*State v. Turnipseed,* 297 N.W.2d 308, 311 (Minn.1980); *accord State v. Buschkopf,* 373 N.W.2d 756, 769 (Minn.1985).

Under this standard we evaluate whether it appeared at the time of the motion that denial would prejudice the defendant. As stated above, when King moved for a continuance, he did not show (or even claim) the witness would soon be found or would testify favorably for him. We therefore conclude the trial court did not abuse its discretion. *See State v. Lloyd,* 345 N.W.2d 240, 247 (Minn.1984) (affirming trial court's denial of continuance so defendant could persuade uncooperative witnesses to testify, because defendant made no offer of proof on testimony and did not explain why witnesses would cooperate if given more time).

### II.

Minn.R.Crim.P. 26.04, subd. 1(1)5 provides that a court may grant a new trial if there is

> [m]aterial evidence, newly discovered, which with reasonable diligence could not

have been found and produced at the trial.

The decision whether to grant a new trial on this ground is within the discretion of the trial court, and its decision will only be reversed for an abuse of discretion. *See State v. Mastrian,* 285 Minn. 51, 73, 171 N.W.2d 695, 709 (1969), *cert. denied,* 397 U.S. 1049, 90 S.Ct. 1381, 25 L.Ed.2d 662 (1970).

■ In denying King's motion, the trial court relied on the standard set forth in *State v. Bergeson,* 203 Minn. 88, 89, 279 N.W. 837, 838 (1938), and it gave the following reasons for its decision:

> I'm not sure that with due diligence that [Dorr] might not have been located by the defense, but the testimony that the defense offers, I find to be cumulative.
>
> Its purpose for admittance is * * * impeachment.
>
> There was testimony at the trial by witness John Czeck who testified basically to the same thing Mr. Door would be testifying to, that in fact the defendant was not present at this home.
>
> So that's all based on [*Bergeson* ] which sets forth the rules for a new trial.

We believe remand on this issue is required because *Bergeson* does not accurately describe the current test for deciding new trial motions based on newly-discovered evidence. The current test is as follows:

> Generally, * * * the defendant has to establish that the evidence was not known to him at the time of trial, that his failure to learn of it was not due to lack of diligence, that the evidence is material, and that it will probably produce an acquittal at a retrial.

*State v. Owens,* 373 N.W.2d 313, 317 (Minn. 1985) (quoting *State v. Swanson,* 353 N.W.2d 128, 130 (Minn.1984)).

The trial court appeared to rely heavily on *Bergeson's* instruction that a new trial should not be granted where the new evidence is cumulative. The current standard does not consider cumulativeness to be an independent ground for denying a new trial; instead, it is a factor that can be considered in the more general context of

whether the new evidence is likely to result in acquittal.

■ Furthermore, we conclude that King's failure to discover the new evidence before trial was not due to a lack of diligence. King had no notice before trial that Blanchard would change her version of the events of that evening and implicate Dorr as a witness. The state argues King could have discovered this evidence before trial if it had interviewed Blanchard. Even assuming this is true, King's reliance on the information in the complaint as to what Blanchard's testimony would be cannot fairly be considered a lack of diligence.

■ We believe remand is appropriate for another reason. The newly-discovered evidence is sufficiently significant to require an evidentiary hearing at which Dorr can testify, subject to cross-examination, so that the court can assess his credibility. Dorr's affidavit contradicts Blanchard's testimony as to how she met King after leaving the party without him, and as to his motive for the attack.

We therefore remand so the trial court may conduct such a hearing and decide King's motion based on the standard set forth in *Owens.*

### III.

■ King argues that under the following statutes he could not be convicted and sentenced for both second and third degree assault.

Minn.Stat. § 609.04, subd. 1(1) (1986) provides:

Upon prosecution for a crime, the actor may be convicted of either the crime charged or an included offense, but not both. An included offense may be any of the following:

(1) A lesser degree of the same crime.

Minn.Stat. § 609.035 (1986) provides:

Except as provided in * * *, if a person's conduct constitutes more than one offense * * *, the person may be punished for only one of the offenses * * *.

Section 609.035 forbids multiple sentencing (even concurrent) for offenses against the same victim as part of one behavioral incident. *State v. Herberg,* 324 N.W.2d 346, 348 (Minn.1982).

Contrary to the State's argument, King does not waive the issue of unlawful sentencing by failing to raise it below. *See, e.g., Ture v. State,* 353 N.W.2d 518, 523 (Minn.1984).

### IV.

King filed a pro se brief raising three issues.

■ First, he argues Blanchard should have been barred from testifying because of her prior inconsistent statements. King was free to cross-examine her on those statements; they do not disqualify her as a witness.

Second, he argues the jury should have been instructed to partially or totally disregard Blanchard's testimony because of her inconsistent statements. The record does not reveal this instruction was requested, and the jury was properly instructed they could consider prior inconsistent statements in determining the believability and weight of testimony.

■ Third, he argues the evidence was insufficient to convict, mainly because he was convicted solely on Blanchard's testimony, and he had alibi witnesses. Viewing the evidence most favorably to the state, the jury could reasonably have concluded that King was guilty. *See, e.g., State v. Daniels,* 332 N.W.2d 172, 180 (Minn.1983).

### DECISION

This case is remanded for (1) a hearing at which George Dorr may testify so that the trial court may assess the credibility of his testimony; (2) a redetermination by the trial court of appellant's motion for a new trial based on newly-discovered evidence, under the standard set forth in *State v. Owens,* 373 N.W.2d 313, 317 (Minn.1985); and (3) vacation of appellant's conviction and sentence for assault in the third degree.

Remanded.